Gardner F. GOODWYN,
Jr., et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 91–1575L, 92–120L.

United States Court of Federal Claims.

Dec. 15, 1994.

Broox G. Holmes, Mobile, AL, for plaintiffs. Broox G. Holmes, Jr. and Conrad P. Armbrecht, II, of counsel.

Stuart B. Schoenburg, Washington, DC, for defendant. Jules Ashford Kettler, Jr., Army Corps of Engineers, of counsel.

## OPINION

BRUGGINK, Judge:

Plaintiffs brought this action pursuant to the Fifth Amendment to the Constitution in order to be compensated for an asserted taking of their real property through the actions of the Government. Trial was held in Mobile, Alabama, November 14–17, 1994. For the following reasons, the court concludes that the Government's actions require compensation.

## BACKGROUND

The twenty-four plaintiffs in this action are tenants-in-common of a tract of land located in Baldwin County, Alabama, consisting of approximately eighty acres. Throughout the trial the parties referred to the property as "Tract 301," and the court does so here. Tract 301 fronts on the Gulf Intercoastal Waterway (GIWW), a largely artificially created, navigable waterway. The land is a portion of a larger parcel previously owned by the plaintiffs' predecessors in interest.

In 1932, as part of the construction of the GIWW by the U.S. Army Corps of Engineers (Corps or Mobile District),[1] the former owners executed a deed granting the United States two types of easements. One easement was to a 500–foot–wide strip of land on which the waterway itself was to be built. The other easement was imposed on the adjoining tract, 301, and granted a right to enter on the land for the purpose of depositing materials dredged in connection with the construction and maintenance of the waterway. The thrust of the complaint is that the Corps' actions in entering on plaintiffs' property and constructing a large dike went beyond the scope of the easement and constituted a destruction of their remaining rights, including the right to access the property to make improvements.

Both parties assert that the language of the deed is unambiguous, yet each side interprets that language in a different way. The Government previously sought summary judgment based on its interpretation of its rights under the easement. It sought, in effect, a declaration that the actions complained of by plaintiffs were permitted under the terms of the deed. In its unpublished order of May 25, 1993, the court denied the motion, holding that the sole right conveyed in the second grant of the 1932 deed is the right to enter upon, occupy, and use the lands at issue for the deposit of dredged material. The court held further that the construction of a dike as alleged by plaintiffs would violate the easement. It was unnecessary, in ruling on the Government's motion, to hold that there had been a taking. That issue was reserved for trial.

### The property before 1987

Tract 301 fronts on approximately 4,000 feet of the GIWW. Both before and after construction of the dike at issue, about nine acres were wetlands subject to the regulatory powers of the Corps.[2] The property is owned in joint tenancy by the individuals indicated in Appendix A. Hooper Matthews and Gardner Goodwyn, Jr., were the only plaintiffs to testify.

Hooper Matthews received his interest in the property as a gift from his mother in the early 1960's. Matthews, who received a Bachelor of Science degree in forestry in 1950, has been involved for many years in buying and selling real estate. He first saw the land at issue briefly in 1948 or 1949. Since 1957, he has been on the property at least annually to look for signs of trespassers, illegal timber cutting, or dumping. He described the parcel when he first saw it as relatively flat, sparsely timbered, and covered with sandy dredge material, occasionally collected in small dunes. The land was accessible from dirt roads coming from the south and east. Although it was possible to drive on Tract 301, sand made a four-wheel drive vehicle necessary in certain places. The land was not boggy, other than in the

---

1. Subsequent references to branches or sections within the Corps will be to those in the Mobile District.

2. Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403 (1988), assigns the Corps the responsibility to regulate discharge of materials into navigable waterways. One must obtain a permit to place fill in wetlands within the Corps' jurisdiction.

areas already mentioned. Matthews testified that there was no visible dike or berm on the property prior to 1987. On two occasions, in the early 1960's or before, Matthews harvested timber after a fire. During the same period, he pulled out several stumps of trees that had been cut down much earlier. These stumps contained large amounts of turpentine. James Hill, a forester with the Corps, testified that these were probably the remains of longleaf pines that had been harvested before the turn of the century. He also stated that longleaf pines thrive in relatively dry soil; drier, for example, than the soil that slash pines require.

Gardner Goodwyn, Jr., (Goodwyn) is eighty years old and lives in Bessemer, Alabama. He has bought and sold land in Baldwin County for personal investment over a long period. His two sons, who both have real estate licenses and live in the Baldwin County area, have kept him informed of trends in local real estate. In 1962, Goodwyn acquired a thirty-five percent interest in the property as an investment. At the time of the purchase, he was aware of the Corps' easement. He first went onto the property in the early 1960's. At that time the property was "high and dry," with no visible dike. According to Goodwyn, access to Tract 301 was possible by driving on a dirt road which followed a section line straight north from Highway 180 to a point along the southeast border of the property. He also testified that he was able to drive on the open areas of the property in a truck not equipped with four-wheel drive. He continued to visit the property on an irregular basis, but at least once a year.

Gardner Goodwyn, III, the son of Gardner Goodwyn, Jr., testified that he first saw the property in 1983. He has hunted on the land, shot target practice, and evaluated it as a possible source for construction sand. His description of the property was much the same as that of his father and Hooper Matthews. His testimony was echoed by that of his brother, Tyler Goodwyn, who has been familiar with the property since 1984. They both testified that Tract 301 was high and dry, sandy, largely covered with pine trees,

and had no standing water. Neither recalls seeing any dikes prior to 1987.

Samuel McKerall also testified as to the condition of Tract 301 prior to 1987. He became interested in buying plaintiffs' land, along with the adjacent parcel to the south, in order to develop a project combining residential, light commercial, and marina uses. In 1984, he made an offer to buy the property, conditioned on being able to obtain the parcel to the south. He recognized that there were about nine acres of wetlands located in the northeast corner of the property, but he believed it was otherwise ideally suited to such a development because it was flat, dry, and adjacent to the GIWW. He also does not recall seeing a dike prior to 1987.

James Rayfield is a real estate broker in the south Baldwin County area. In 1983, he drew up plans for turning Tract 301 into a combination residential and light commercial development, including a marina. He estimated that doing the engineering work and putting in roads and utilities, excluding the marina, would cost about $650,000. Afterwards, he estimated that the site would have a sale value of over $3 million. He believed Tract 301 could be developed because it was easily accessible from land, was elevated and dry, had nice vegetation, and had access to the GIWW. He did not recall seeing any existing dikes as of 1983.

Paul M. Warren is a Supervisory Area Engineer with the Corps' Mobile District. He became familiar with Tract 301 in 1974. At that time he observed a low dike on the property approximately one to two feet in height, with a maximum height of five feet at the northeast corner. Although the dike was discontinuous, it was sufficiently connected to piles of sand to generally form a continuous circuit around three quarters of the property. He explained that prior to 1974 it had not been standard practice for the Corps to construct dikes in a complete loop before depositing dredged material. Rather, low restraining dikes were used to keep solids from flowing into certain areas, while permitting water to drain off in other directions.

Using paired photographs from the 1970's and a magnifying stereoscope, Warren showed the court how to put ground relief

features into three dimensions. The point of the exercise was to look for a pre-existing dike. The court observed a line defining the area that was later enclosed by the large dike. Although distinct enough to be observable in most locations, it was very faint in other areas. It appeared most distinct along the south boundary and did not appear to have much elevation. The court notes that this is the same line Goodwyn identified as a sand road that ran along most of the southern boundary of the property.

Arthur Hosey, a Corps biologist, also testified about the pre-dike condition of Tract 301. Currently, Hosey is in charge of the Corps' Jurisdiction and Enforcement Section of the Regulatory Branch, which enforces regulations regarding jurisdictional wetlands. At the request of the Mobile District Real Estate Section, Hosey went onto plaintiffs' land in June of 1991 in order to see how much of the site was wetlands as of that date and also to estimate how much would have been wetlands prior to construction of the dike in 1987. He used a soil auger to determine the pre-dike condition. He tested only on the northwest portion of Tract 301 outside the dike. Hosey testified that below the surface layer there were "plummer" soils. This characterization describes a soil that does not drain well and permits water to "perch" at a level above the natural groundwater table. Because this type of soil tends to be wet, he projected that prior to 1987 much of Tract 301 would have been jurisdictional wetlands and thus subject to restrictions on fill.

The court is not inclined to give much weight to Hosey's analysis. It runs counter to the eyewitness descriptions of Tract 301 given by the Goodwyns, Rayfield, McKerall, and Matthews, concerning its pre–1987 condition. Each of these witnesses testified that prior to construction of the dike in 1987 there was no standing water on the property,[3] except in the places that are currently jurisdictional wetlands. Furthermore, Hosey's analysis is contradicted by the fact that there were enough longleaf pines on the site, even

before dredging began, to make removal of stumps commercially feasible. Finally, Hosey's assessment is also at odds with the court's impression, drawn from the site visit discussed below, of acreage not enclosed within the dike.

Aerial photographs of Tract 301 go no further back than 1944. A photograph from that year shows that the site had received a substantial amount of dredged material. That photo shows a particularly large and apparently fairly recent deposit in the northwest quadrant. There is little vegetation present. Subsequent photographs reflect the gradual disappearance of the more pronounced indentations on the north shore and an increase in vegetation on the whole site. None of the photos appear to the court to show standing water, and no witness suggested otherwise.

The court finds that only small portions of Tract 301 would have been wetlands prior to 1987. The lion's share of the site was dry enough to develop. The Government argues that this condition was brought about because the Corps deposited dredge material on the site over many years. However, the court notes that its finding applies to both the period before the easement was granted and the period between the mid–1930's and 1987. There is no question, based upon a comparison of the photographs, that the deposition of dredge material improved the site. It certainly stabilized the northwest and north central shoreline, and generally elevated the entire property, making it more useable. The change brought about by the easement was, nevertheless, not so great as to mark the difference between land that could and land that could not be developed. Moreover, as the court concludes below, the improvements brought about by years of dumping were an integral part of the property by the early 1960's and consequently became part of plaintiffs' fee interest.

The court also finds that there was a pre-existing dike in most places where the dike

**3.** Matthews explained that on one occasion he came across a small accumulation of water in an area of recent dredge deposition. Using a shovel, he cut a small channel by hand, and the water drained out.

currently exists[4] or an elevated "pad" on Tract 301 that might have created the appearance of a dike. In either event, the structure was sufficiently unobtrusive that it made no impression on non-Corps visitors to the property. Bragg Boyington, who worked as an equipment operator during construction of the new dike, testified that he saw no previous dike while working at the site. In addition, whatever was there prior to 1987 did not impede vehicular access in any way. Consequently, the court finds that the 1987 work was not merely an "improvement" of an existing dike.

*Construction of the 1987 dike*

By the mid–1970's, the Corps began to develop a plan to change the method for disposing of dredge materials from the GIWW. This move was prompted in part by the 1972 amendments to the Clean Water Act, Pub.L. 92–500, 86 Stat. 816 (codified as amended in scattered sections of 33 U.S.C.), which further limited runoff from dredge and fill. The Corps concluded that the best practice would be to use fewer sites, each capable of holding more material. In order to maximize fill capacity, each site would be completely enclosed by high dikes. In a May 1976 Final Environmental Impact Statement, the Corps identified Tract 301 as one of five such fill sites it had selected in Baldwin County. The plan was to focus all dredge deposition on these sites, instead of scattering it in smaller quantities on many locations.

The Corps developed these diking plans and assessed their environmental impact. It published its proposals and findings but did not specifically notify landowners. It is uncontested that if consent was necessary for the project, plaintiffs never gave it. Nor was there any evidence that they were otherwise aware of the work as it was being done. Because the site is uninhabited and sufficiently isolated, this does not surprise the court.

Work began on Tract 301 in late–1986 and was completed in March 1987. Heavy, earthmoving equipment took soil from the interior of the site and pushed it toward the edges, forming a continuous dike approximately two miles long. The dike encloses between sixty and sixty-five acres of Tract 301. The Corps built the dike primarily by using sand from dredging. At some points, however, the pre-easement ground level was breached.

The parties agree that the dike was expected to last as long as fifty years. Judging by the degree of erosion that has occurred after only seven years, the court doubts that the dike will hold its shape that long. There is no doubt, however, that it is massive and completely alters the condition and utility of Tract 301. Absent intervention by man, it will permanently alter the site. Even though it has been breached at one point, it still causes water to pond in the lower areas. Unless the dike erodes a great deal more or is further breached, the interior of the site will remain inaccessible to vehicular traffic, except perhaps to more adventurous four-wheel drivers.

Warren testified that construction of the dike cost a little over $200,000. Indirect evidence from the Government's appraiser suggests that it would currently cost approximately $56,000 for a "rough leveling" of the dike using bulldozers and scrapers.

*Events after construction*

In mid–1987, Matthews and Goodwyn found out about the dike and inspected the property. Matthews initially permitted Goodwyn to take the lead in discussions with personnel in the Mobile District of the Corps. Based upon a conversation that occurred in 1987, Goodwyn understood that the Corps would be filling in the enclosure. This did not concern him. In fact, he felt that if the Corps filled the interior of the dike with dredge material, it would make the site more valuable. The Corps did not place any fill on the tract, however, and in fact has never used the site since it created the dike.

Goodwyn called a year later and was told that the Corps planned to fill the site in August 1989. When this did not happen, he called again in 1990. At this point, whoever he spoke with at the Corps office informed him that the agency was "uncertain" when Tract 301 would be filled and that it did not know what it was going to do with the site.

---

4. Corps documents from the 1970's and 1980's refer to the site as "diked."

When it became obvious to Goodwyn that the Corps was not in any hurry to utilize the dike, he became concerned, and the tone of his contacts with the Corps changed to a demand for compensation for "ruining" the tract.

The Government has stipulated that it has "determined that it is necessary to acquire a fee interest in the subject property in order to prevent the Plaintiffs from being able to exercise their reserved right to improve the property." *Plaintiffs' Proposed Finding of Fact 17.* This stipulation is consistent with the testimony of Walter S. Patton, an attorney in the Mobile District office. His counsel, from at least November 4, 1987, was that the Corps should acquire greater interests in dredge deposition sites along the GIWW. At trial, he testified that his advice was prompted by the fact that landowners retained the right to develop the tracts and that such development would extinguish the Corps' right to deposit dredge material. Because of the increasing development in the area, in 1987 he wrote that it might become impossible for the Corps to conduct further maintenance dredging. He also stated at trial, however, that in his opinion the dikes completed in 1987 were not within the scope of the easement.

Some time during 1988, the Mobile District sought permission to condemn or purchase Tract 301. By December 13, 1988, the Real Estate Branch was asked to initiate steps to acquire the five Baldwin County GIWW disposal sites. By the end of 1990, the Corps had told plaintiffs of its decision to either buy or condemn a fee interest in Tract 301. In a series of meetings and telephone conversations beginning in August 1991, the parties attempted to strike an agreement on the value of the tract so that the Corps could purchase it. Although Goodwyn periodically threatened to sue for a taking, he was asked to delay such action while negotiations continued. On November 5, 1991, Goodwyn was told to stay off the property because the Corps wished to exercise "total dominion" over it. These suits were commenced in November 1991 (91–1575L) and February 1992 (92–120L).

*Tract 301 After 1987*

Prior to trial, and at the request of both parties, the court conducted a two-part site visit, accompanied by legal representatives for both parties, the appraisers, and Corps engineers. The first was an aerial reconnaissance of Tract 301, the adjacent area, and sites used by both sides' appraisers as "comparables." The second involved a walking inspection of the property. The overflight, which lasted approximately thirty-five minutes, gave an excellent visual reference in terms of access to the property as well as its proximity to other developed areas. The walking inspection covered or gave visual access to virtually all the property. It took about one hour. Although no substantive discussions were held, the court did ask whether the age of trees in certain areas could be determined. The court makes the following findings based on both the site visit and trial testimony.

Tract 301 is located approximately one and one-half miles by road off of Highway 180, a major, two-lane, blacktop road. The parcel is not visible from Highway 180. Access to the property, which is less than ideal, is by Gulf Bay Road. The entirety of this road leading to Tract 301 is maintained by the City of Orange Beach. Approximately two-thirds of the road to the property is blacktop, with the last third dirt. Immediately off of Highway 180 the right-of-way is approximately 100 feet wide, but it narrows substantially before reaching the site. The route to the site is not direct, as the road winds through a few small residential developments and a large amount of unimproved land.

At some time before construction of the 1987 dike, Tract 301 was brought into the City of Orange Beach, Alabama. Prior to its incorporation into Orange Beach, the property had not been zoned. As of March 1987, the date the dike was completed, Tract 301 was zoned "RS–1" (single family residential). In 1991, the zoning was changed to "Agricultural."

On the north side of the property, approximately 4,000 feet of Tract 301 fronts the GIWW. At the east end of the property, the waterway widens into Wolf Bay. The GIWW continues through Wolf Bay. The adjacent

tract on the east side of the property is a small development of older, less-expensive houses, built to access Wolf Bay. Further to the east, along the access road, is a development of newer, more substantial houses strung along Wolf Bay. The land on the west and south sides of Tract 301 appeared to be undeveloped.

The most prominent feature of the property is the new dike that was completed in March 1987. In most places, the dike appeared to be ten to twelve feet above the surrounding terrain. It is approximately ten feet wide at the top, but it widens substantially at the bottom. The dike is composed primarily of sand. Although it appeared to be quite firm, it was eroded at all locations in varying degrees. There was a discontinuity in the dike in the northeast quadrant. From testimony it appears that the Corps breached the dike at that location within the last two years to drain water that had accumulated inside the dike. The landowner to the south had complained that water trapped within the dike was preventing proper drainage from his property. At the time of the court's site visit, there were still two substantial accumulations of water within the perimeter of the dike. It was apparent that the interior of the diked area was lower in places than the land outside.

The new dike roughly follows the south property line beginning at the southeast corner, but it bows south onto the adjoining property before turning north at the west end. Fourteen acres of the area enclosed is not plaintiffs' land. About twenty acres of plaintiffs' land is outside the dike on the north side. That portion of Tract 301 is accessible only on foot or from the GIWW. The site visit party traversed much of this part of the property, particularly at the west end. The terrain at that point was firm, dry, and covered with large pine trees. Toward the east end of the parcel, outside the dike, the terrain was lower and wet.

It appeared to the court that the new dike was either built on the remains of an older, much lower dike, or that all of Tract 301 was slightly elevated over adjoining land. Whatever the cause for the difference in elevation, it appeared that, not including the new dike,

the property was elevated over the adjoining property, perhaps by two to three feet. From trial testimony it is clear that this is due to deposition of dredged material.

During the site visit, the court asked whether it was possible to determine the age of certain large pine trees growing along the south edge of the property, on what appeared to be the old dike. James Hill, a Corps forester, did borings on those trees after the site visit. He testified that the largest trees were slash pines, approximately twenty to twenty-five years old. He also explained that even a few inches of soil placed permanently around the base of a pine tree will smother it. This testimony suggests that the structure that appeared to be either a small dike or site-wide platform pre-existed the pine trees.

Documents preliminary to the decision to construct the dike on Tract 301 indicate that the Corps anticipated dredging on a three-year cycle. In the seven years since construction of the dike, however, it has never been used for the dumping of additional dredge material. Although Warren explained that this is because the Corps has had no need to use it, he also testified that access to Tract 301 was "critical" for the Corps' dredging program in the area.

## DISCUSSION

### The Parties' Rights Under the Easement Deed

The court will repeat here the substance of its ruling of May 25, 1993. In that order, the court denied the Government's motion for summary judgment predicated on the proposition that it had the right, under the 1932 deed, to construct the dike that was completed in 1987.

There are two granting clauses in the deed. The granting clause appearing first conveyed to the United States broad easement rights in a 500–foot–wide strip of property on which the United States would construct a canal. This property does not include Tract 301. By this first grant, the United States obtained an easement giving it the right to dig a canal and enter upon, occupy, and use the land for deposit of

dredged material and for such other purposes as might be needful in constructing, altering, or maintaining the canal. The first grant restricted the owners' rights in the 500–foot–wide tract and specifically prohibited them from making improvements. The easement was procured to implement legislation authorizing construction of the GIWW. The legislation specifically permitted payment by the United States for these rights. Act of July 3, 1930, ch. 847, 46 Stat. 918, 925.

The second granting clause in the deed pertained to the lands adjoining the 500–foot–wide tract. This property does include Tract 301. By this second grant, the plaintiffs' predecessors in interest granted:

> unto the United States of America ... for such purpose as may be needful in the construction, alteration, maintenance, and operation of said waterway or canal the right to enter upon, occupy and use any portions of the lands ... for the deposit of dredged material, soil, supplies, machinery or equipment, used or to be used in the construction, alteration, maintenance or operation of said canal or waterway....

The deed then adds restrictions to this second grant. The United States may not deposit dredged material on any lands that have been improved, although damages for doing so are limited to damages to actual improvements. The deed states that the grant "shall not be construed as granting to the United States of America any right, title or interest in and to the said lands adjoining the lands or right-of-way except as expressly herein granted." As part of the consideration for the grant, the Government agreed that:

> soil or other dredged material ... will be deposited on the bank a sufficient distance from the shore line to prevent its running back into the water, and so far as is practicable, upon the lower areas of land; and in no event shall the natural tributaries emptying into existing waters b[e] filled or dammed.

The only monetary consideration recited in the deed was one dollar.

Both grants in the easement deed contain, in substance, the phrase "for such purpose as may be needful in ... maintenance ... of said canal." In the first grant it is part of the right granted. In the second grant, however, it describes the legitimate purposes for exercising rights granted in the succeeding clause. It does not, therefore, broaden the Corps' right to "enter upon, occupy, and use any portion of [Tract 301] ... for the deposit of dredged material, soil, supplies, machinery or equipment...."

*Was There a Taking?*

■ The court concludes that entering onto plaintiffs' land and constructing from soils on site a permanent dike twelve feet high and two miles long does not fall within the rights granted by the easement deed. The fact that most of the sand used to construct the dike was placed on the site by the Corps does not alter the result. It appears to the court that the considerations between the parties at the time of the deed's creation were the rights and limitations exchanged and undertaken as expressed in the instrument itself. While the landowners gave up a strip of land 500 feet wide, the remaining tract presumably benefitted from access to the GIWW and from the additional soil. As Paul Warren testified, the Corps claims no proprietary interest in the dredged material once it is deposited on plaintiffs' land. After the material is deposited, the plaintiffs have the right to assume that it becomes a permanent addition to the property. In any event, nothing in the deed grants the Government the right to excavate on Tract 301. It is also specifically precluded from damming natural drainage.

■ Plaintiffs own the fee interest in Tract 301. Although this fee interest is subject to the Government's right to deposit dredge material, that right is in turn subject to the plaintiffs' legal right to develop the property. The deed plainly contemplates that the landowners retain the valuable right to do whatever they wish with the land, without having to accommodate the Government's easement. Once development takes place, the Government loses the unfettered right to deposit material. Consequently, although plaintiffs did not have the right to exclude the Government from Tract 301 for all purposes, they did have the right to ex-

clude the Government beyond its limited rights under the easement. Those rights did not include construction of a dike using native materials, thereby blocking access to the interior of the tract.

As the Supreme Court explained in *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), "the 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation." *Id.* at 179–80, 100 S.Ct. at 393 (footnote omitted); *see also United States v. Pueblo of San Ildefonso,* 206 Ct.Cl. 649, 669–70, 513 F.2d 1383, 1394 (1975). As the Court later held in *Loretto v. United States,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), the traditional rule is that "a permanent physical occupation of property is a taking." *Id.* at 441, 102 S.Ct. at 3179. The Government's presence on Tract 301 was such a physical occupation and therefore took plaintiffs' remaining right to exclude uses other than those spelled out in the easement deed.

The construction of the dike also posed an immediate physical barrier to the plaintiffs' right to develop the land. Upon completion of the dike in March 1987, plaintiffs lost all useful access onto Tract 301.[5] In addition, once the dike was in place, the property ceased to be saleable for development purposes, not only because of the additional cost involved in removing the dike, but also because of the message the dike conveyed to the landowners and potential purchasers. No reasonable person would view the dike as a tentative gesture by the Corps, removable at the owners' wishes. The court finds that as of the end of March 1987, the Corps would not have permitted plaintiffs to make any improvements to the property. Development would have resulted in wastage of the over $200,000 cost of building the dike. More important, it would have deprived the Corps of access to a site it deemed critical to its canal maintenance program. It is clear from the Corps' subsequent conduct and statements that if plaintiffs had attempted to make improvements, the Corps would have immediately condemned the property or attempted to purchase it voluntarily.

▮ In the exercise of its sovereign powers, the Government may take property without the formality of a condemnation proceeding, but it must pay compensation when it does so. In the circumstances at hand, the action of the Corps in building the dike, combined with its determination not to permit any further development, had the effect of taking plaintiffs' remaining rights in Tract 301. Under these circumstances, the Corps exercised complete, physical dominion over plaintiffs property.[6] This constituted a taking within the meaning of the Fifth Amendment.

Plaintiffs allege that the taking occurred when the dike was begun in 1986. The Government maintains that there was no taking and thus offers no alternative date. The court finds that the date of taking is March 31, 1987, when the dike was complete. Although it was perhaps not the Corps' intent at that moment to exceed the Government's rights under the easement,[7] as of that date, the extent of the Government's dominion was complete and the plaintiffs' right to develop the property was taken. As the Court of Claims held in *Eyherabide v. United States,* 170 Ct.Cl. 598, 345 F.2d 565 (1965):

5. The court finds that the subsequent direction for plaintiffs to stay off the property is reflective of the Corps' position in 1987.

6. The Government's suggestion that access *to the* plaintiffs' property was not cut off is hardly an answer. It would be small consolation to the plaintiffs to be limited to viewing Tract 301 from their neighbors' property.

7. Although the Government was not granted the right under the easement to construct the dike, the actions of its employees in constructing the dike were not unauthorized. The work was accomplished using appropriated funds. The very concept of eminent domain presumes that the Government does not have a property interest in the thing it takes until it exercises its sovereign powers. *See Hendler v. United States,* 952 F.2d 1364, 1378 (Fed.Cir.1991) ("[T]he issue is *not* whether the Government had the right to impose itself and its activities on these plaintiffs. Whatever right the plaintiffs had to be let alone was overcome by the Government's need in the interest of public health and safety....") (emphasis in original).

Federal law recognizes that, although there may be no official intention to acquire any property interest, certain governmental actions entail such an actual invasion of private property rights that a constitutional taking must be implied.... The interference with use or possession may be so substantial and of such a character that it cannot be done without compensation under the Federal Government's regulatory and executive powers. Where these factors exist and a constitutional taking is implied, it is assumed that the United States has acquired a definite interest in the property, permanent or temporary, such as fee title, an easement, a servitude, or a leasehold.

*Id.* at 601, 345 F.2d 565 (citations omitted).

■ In addition, the court also finds that the dike is "permanent" within the meaning of judicial gloss on the takings clause. The Government agreed to plaintiffs' proposed finding of fact that the dike has an estimated useful life of twenty-five to fifty years. Internal correspondence of the Corps suggests an "estimated life" of fifty years. Although the dike could be removed in much the same manner as it was built, the court has already held that removal was, as a practical matter for plaintiffs, impossible.

■ Moreover, permanence for purposes of establishing a taking does not require proof of deprivation for eternity. The Court of Claims recognized the inquiry as more practical. In *Armijo v. United States,* 229 Ct.Cl. 34, 663 F.2d 90 (1981), the court considered at what point the nominally temporary closing of grazing lands became a permanent taking:

The landowner cannot plan the future use of his land, or sell to others who have a future use in mind, because both know the project, the White Sands Missile Range, will still be there. It is stipulated that there is no prospect of its going away in the foreseeable future, and this, for eminent domain purposes, is the same as perpetuity.

229 Ct.Cl. at 37, 663 F.2d at 93; *see also Kabua v. United States,* 212 Ct.Cl. 160, 546 F.2d 381 (1976), *cert. denied,* 434 U.S. 821, 98 S.Ct. 63, 54 L.Ed.2d 77 (1977). The distinction drawn by the Federal Circuit in *Hendler v. United States,* 952 F.2d 1364 (Fed.Cir. 1991), is also apt: "If the term 'temporary' has any real world reference in takings jurisprudence, it logically refers to those governmental activities which involve an occupancy that is transient and relatively inconsequential, and thus can properly be viewed as no more than a common law trespass *quare clausum fregit." Id.* at 1377 (emphasis in original). The court finds that the taking of Tract 301 was permanent as of March 31, 1987.

*Compensation*

Both parties offered the opinion evidence of an expert appraiser. Each appraiser offered his assessment of the value of Tract 301 as of the end of 1986, although the appraisals were conducted somewhat later. Edward N. Morris, Jr., who testified for plaintiffs, explained that in his view the highest and best use of the property is for industrial purposes. Morris found five sales in Baldwin County on the GIWW that he considered appropriate to use as comparables. Two of these sales are related, in that one is the parent tract of the other.

Kirby Smith testified for the Government. His search for comparable sales was broader than that of Morris. Smith included four of the five parcels relied on by Morris but added three others that front on Wolf Bay or Perdido Bay. The three additional parcels on Smith's list were apparently to be used for residential development. Smith's search was somewhat more expansive because in his view the highest and best use of Tract 301 is residential. He based this opinion on the uses of surrounding property, access, zoning, and comparable sales. He conceded, however, that Tract 301 could have been developed as an industrial site, despite unspecified "hurdles."

■ The court will use all eight parcels offered between the two appraisers. It agrees with Smith that sales of undeveloped land for residential purposes are relevant to determining a value for Tract 301. Gardner Goodwyn, Jr., expressed the view that the highest and best use of the property would

be either industrial or residential, particularly single-family waterfront housing. As noted earlier, McKerall testified that when he was considering the purchase of Tract 301, it was with the intention of combining it with the land to the south to use as a development with combined residential, light commercial, and marina uses. Rayfield had similar ideas.

Moreover, there had not been any recent industrial development along the waterway. The court concludes that the land was suited for both industrial and residential purposes.

In order to use a single method of referring to the parcels used by the appraisers, the court adopts the following numbering system:

| | COURT'S NO. | MORRIS'S NO. | SMITH'S NO. |
|---|---|---|---|
| 1. | O'Connor to Caron | Sale No. 1 | Not used |
| 2. | Caron to Canal Properties | Sale No. 2 | Sale No. 20.026 |
| 3. | Meyer to Canal Gate | Sale No. 4 | Sale No. 20.030 |
| 4. | Meyer to Johnson | Sale No. 5 | Sale No. 20.029 |
| 5. | Bagley to Reynolds | Sale No. 6 | Sale No. 20.031 |
| 6. | Blue Water Inv. to Griffith | Not used | Sale No. 20.028 |
| 7. | Sanders to Luce & Whiting | Not used | Sale No. 20.033 |
| 8. | Crawford to Osprey, Inc. | Not used | Sale No. 20.034 |

In order to make the parcels they considered comparable to Tract 301, both appraisers adjusted the cost per acre and the cost per linear foot of waterfront (front foot) of each tract. Nonetheless, the methods used by the appraisers to adjust the sales prices produced completely different results, even with respect to the four common parcels.

Both experts used an inflation factor for each year prior to the date of taking. Morris adjusted each of his sales by twelve percent per year. He did not justify to the court's satisfaction the derivation of his inflation factor. The Government concedes some escalation in values, however, and the court will use its figure of six percent, which Smith described as "reasonable." Nevertheless, no inflation factor is appropriate after September 1985. McKerall referred to that month as the beginning of a "bust." Morris testified that the market "peaked out" in 1985.

After adjusting the value of the comparables for inflation, Morris then adjusted the resulting value per acre or front foot for three additional factors: size of the comparable; location in comparison to Tract 301; and utility, a term he used to cover such considerations as amount of wetlands and access. As to the utility factor, Morris discounted the derived prices per acre and per linear foot by five percent to reflect the presence of wetlands on Tract 301 and its relatively undesirable access. In the court's view, the impact of wetlands and access should be evaluated separately.

Both appraisers adjusted for size, but with a certain exercise of judgment. According to the expert testimony, the price per acre for a tract larger than Tract 301 requires an upward adjustment based on the theory that larger parcels tend to sell for less per acre. Because the witnesses' adjustments are very similar as to identical parcels, the court will

use Smith's size adjustment for the seven parcels he compared and Morris's adjustment for the remaining parcel (No. 1).

Morris did not isolate a separate adjustment for location in comparison to Tract 301 because his five comparables were all located along the GIWW in Baldwin County. Smith, on the other hand, did make a separate adjustment for location, but he used the term to mean "comparable access," a phenomenon Morris included under "utility." Looking first at Morris's analysis, the court agrees that no adjustment for location, in a geographic sense, is required for his five comparables. Conversely, Smith's three additional comparables do need such an adjustment. Parcel Nos. 6 and 8, located on Wolf Bay, are not directly on the GIWW. Parcel No. 7, on Perdido Bay, is likewise not located directly on the GIWW. Only parcel No. 6 is reasonably accessible to the right-of-way of the canal. The other two parcels are at the north end of their respective bays. The court estimates that these three parcels need to be adjusted upward ten percent, thirty-five percent, and thirty-five percent respectively, because Tract 301 is comparatively more valuable due to its location directly on the GIWW.

With respect to access,[8] Smith penalized Tract 301 substantially in comparison to five of his seven comparable sales (parcel Nos. 2, 3, 4, 5, and 6). The court agrees with Smith that a downward adjustment should be made because of the access advantage enjoyed by these parcels. Parcel Nos. 2, 3, and 4 all front on hard surface roads and have good access to Highway 57, a major north-south, four-lane road, and parcel Nos. 5 and 6 both front on Highway 181. Moreover, this access adjustment should also apply to parcel No. 1, the parent tract for parcel No. 2, which Smith did not use in his appraisal.

Smith made a downward access adjustment of thirty-five percent for parcel Nos. 2, 3, 4, and 5, but for parcel No. 6, he made a ten percent downward adjustment. The court sees no principled distinction between parcel Nos. 5 and 6, both of which front on Highway 181. On the other hand, Morris's downward adjustment for access is no more

than five percent. In the court's view, a five percent adjustment does not adequately reflect the significant advantages of parcels directly fronting on blacktop roads, while Smith's thirty-five percent adjustment seems to give insufficient credit to Tract 301 as compared with parcel Nos. 7 and 8, both of which are considerably less attractive in terms of access. Thirty-five percent also seems disproportionate when compared with Smith's use of a ten percent adjustment for parcel No. 6. The court will employ a negative twenty-five percent access adjustment for parcel Nos. 1 through 6.

Although parcel Nos. 7 and 8 each have less favorable access than Tract 301, Smith made a positive adjustment only to the latter parcel. Parcel No. 8 was adjusted upward by fifteen percent. The court finds that this adjustment was appropriate because it is located several miles from the GIWW and is distant from the canal's more built up areas. The court disagrees, however, with Smith's failure to make a similar adjustment to parcel No. 7. In terms of access, parcel No. 7 is more comparable to parcel No. 8 than it is to Tract 301. Consequently, the court will employ a positive fifteen percent adjustment to this parcel as well.

Smith also made an adjustment for "physical characteristics," which included differences in topography and amount of wetlands. The court was given no valid reason, other than wetlands, to adjust for topography. The suggestion that Tract 301 was less desirable because of the presence of sand dunes was not borne out by fact witnesses. Parcel Nos. 1, 2, 3, 4, and 5 apparently did not have any wetlands. In that respect, they are physically comparable to the dry parts of Tract 301. One approach to valuation would be to use the prices per acre of those comparables with no adjustment for physical characteristics. The prices per acre derived in that manner would then be applied only to the seventy-one acres of non-wetlands on Tract 301. Alternatively, because eleven percent of Tract 301 is wetlands, no more than that amount should be discounted for the physical characteristics of those compara-

---

**8.** In his appraisal, Smith referred to this adjustment as the "location" adjustment.

bles. Even though less desirable than dry ground, wetlands might nevertheless create value as buffer or if a developer believed it could get permits for filling. Smith used ten percent or fifteen percent as the discount factors for parcel Nos. 2, 3, 4, and 5. The court will adopt his lowest figure, ten percent, and apply it to parcel No. 1 as well. The results from both alternatives are considered below.

With respect to parcel No. 6, Smith made an upward adjustment of fifty percent for physical characteristics. Although Morris did not use parcel No. 6 as a comparable, he apparently would not disagree with this upward adjustment, due to the large amount of tidal flats located on this parcel. Consequently, the court will adopt Smith's physical characteristics adjustment for parcel No. 6. Moreover, the court also has no basis for questioning Smith's physical characteristics adjustments for parcel Nos. 7 and 8, and therefore accepts his evidence in that regard.

In addition to the adjustments previously discussed, Smith employed a "condition of sale" adjustment in regard to parcel Nos. 5 and 6. Because he believed that too high a price had been paid for these parcels, Smith reduced the prices per acre by factoring in a negative adjustment. Subsequent to the sale of parcel No. 6, that tract was purchased at a foreclosure sale for an amount that was substantially below the 1984 sales price of $2.1 million. The fact that it sold for less at a subsequent foreclosure sale, however, does not persuade the court that the 1984 sale was not indicative of values at that time. In fact, at the time of the 1984 sale, the property qualified for a $3 million mortgage. Moreover, Smith had no information suggesting that the sale of parcel No. 6 was not an arms-length transaction. The same is true of parcel No. 5. In that instance, Smith gave weight to the purchaser's belief that he paid too much. Perhaps the seller felt he sold it cheap. Neither belief would be grounds for making an adjustment. Consequently, the court rejects Smith's "condition of sale" adjustments for parcel Nos. 5 and 6.

Attached as Appendix B is a chart showing the effect of making the adjustments described above. The net effect is that the average, adjusted sales price of the eight comparables is $14,581 per acre. The total indicated value of Tract 301 is $1,166,490.

Because five of the eight comparables come from the "industrial" parcels used by Morris, these calculations are slightly weighted toward that characterization. In the court's view this is appropriate because Tract 301 is more like the industrial parcels than the residential parcels. If anything, the weighting toward the industrial characterization could be somewhat greater. If only the five industrial tracts are used as points of comparison, the average price per acre would be $15,934, and the value of Tract 301 would be $1,274,720.

To further isolate a direct comparison between the dry portion of Tract 301 and the industrial tracts, Appendix C reflects what the indicated value would be if the seventy-one acres of Tract 301 that are not subject to wetlands limitations were compared with parcel Nos. 1, 2, 3, 4, and 5, not adjusted downward for wetlands. The adjusted values of those sales, on average, is $18,916. The total value of Tract 301 would be $1,343,064, plus some amount for the nine acres of wetlands.

There is obviously a large amount of judgment reflected in these calculations, both on the part of the experts and on the part of the court. To test whether the figures bear some correspondence to reality, it is appropriate to compare them to the amounts of two 1984 offers to purchase plaintiffs' property. The better documented of the two was from Frank Merrill, Jr., and Samuel McKerall.

At trial, McKerall testified that the two men thought they were offering to purchase the entire parcel. The offer was as follows: "$375.00 per waterfront foot on the canal and $22,727.27 per acres (4,000 feet/66 acres)," or $1,500,000. The offer stated that if there were more acreage in the parcel or if the waterfront were longer than 4,000 feet, the price would be adjusted. Assuming these adjustments were truly independent, if the sale had been consummated, presumably the buyers would have had to pay for eighty acres at the same per-acre price, or approxi-

mately $1.8 million. It is not clear whether Merrill and McKerall intended to pay for an additional fourteen acres if that included the nine acres of wetlands. Arguably under the contract they would not have had the option to do otherwise. There was no suggestion during trial that the waterfront was anything other than 4,000 feet.

A reasonable assumption appears to be that Merrill and McKerall thought the property was worth at least $1,500,000 in 1984. That value, however, was predicated on a critical assumption. The offer was made contingent on the offerors being able to acquire the eighty acres adjoining Tract 301 on the south side. This would have created a parcel of 160 acres, fronting on both the GIWW and Highway 180. Although it is impossible to know how much value the offerors believed was added to Tract 301 as a result of this adjoining acreage, the court finds that it undoubtedly was significant in their eyes.

Although it was rejected by the owners of Tract 301, the offer from Merrill and McKerall was a serious one, as evidenced by the $20,000 binder that accompanied it. In the court's view, this offer is some evidence of the value of Tract 301.

The second offer regarding Tract 301 came from R. Thomas Thompson and was received by the plaintiffs in March 1984. This offer was for $21,500 per acre for "approximately 84 acres." Assuming the eighty-acre figure used in this action is correct,[9] Thompson would have had to pay $1,720,000. Thompson had difficulty putting together financing, however, and ultimately nothing came of the offer. The court declines to give much weight to it.

After considering both the evidence of the appraisers and the offers of sale, the court finds that a reasonable range for the value of the eighty acres is between $1.1 million and $1.5 million. The property was not worth less than $1.1 million, and it was not worth more than $1.5 million. A middle value, and the one the court assigns, is $1.3 million.

## CONCLUSION

The actions of the Corps in constructing the 1987 dike had the effect of taking Tract 301. Plaintiffs are entitled to be paid $1.3 million, with simple interest from the date of taking, March 31, 1987. Plaintiffs are also entitled to reasonable costs and expenses, including attorney fees, actually incurred because of this proceeding. 42 U.S.C. § 4654(c) (1988). Plaintiffs shall file a submission on or before January 13, 1995, if they wish to claim costs and expenses. Defendant shall respond within seventeen days of service. Plaintiffs shall reply within thirteen days of service. Judgment will be deferred pending resolution of costs and expenses. Final judgment, to be made payable to plaintiffs' counsel in trust for plaintiffs, will have the effect of terminating all of plaintiffs' right, title, and interest to the property.

### Appendix A
Owners of Tract 301 and Their Respective Percentages of Ownership

| OWNER | PERCENTAGE OF OWNERSHIP |
|---|---|
| 1. Gardner F. Goodwyn, Jr. | 35.6741565 |
| 2. John T. Cochrane, Jr. (First Alabama Bank as Executor) | 33.3333333 |
| 3. AmSouth Bank, Trustee— Herman H. Wefel, III Family Trust | 6.5074940 |
| 4. Hooper W. Matthews, Jr. | 1.6268725 |
| 5. Betty Matthews LaPenna | 1.6268725 |

9. According to the testimony of the plaintiffs' appraiser, Morris, the subject property consists of eighty acres. This testimony was not challenged by the Government. Moreover, the Plaintiffs' Proposed Finding of Uncontroverted Fact number one also describes Tract 301 as consisting of eighty acres. The Government did not contest this proposed finding.

| OWNER | PERCENTAGE OF OWNERSHIP |
|---|---|
| 6. Wefel A. Matthews | 1.6268725 |
| 7. Doris Dale Matthews Ash | 1.6268725 |
| 8. Cynthia Ann Matthews Coville | 1.6268725 |
| 9. Hooper W. Matthews, III | 1.6268725 |
| 10. Dorothy Dianne LaPenna | 1.6268725 |
| 11. Mary Beth LaPenna | 1.6268725 |
| 12. Ellen Ann LaPenna | 1.6268725 |
| 13. Wefel A. Matthews, Jr. | 1.6268725 |
| 14. James Hooper Matthews | 1.6268725 |
| 15. Dorothy Louise Matthews | 1.6268725 |
| 16. Barnes Flournoy Lovelace | 1.1704120 |
| 17. Edith H. Lovelace | 1.1704120 |
| 18. Esther M. Warner | 0.8739076 |
| 19. Raymond W. Hudson, Trustee under Declaration of Trust dated 12/31/58 for the benefit of Raymond W. Hudson, Wilma V. Elmer, and James W. Hudson, Jr. | 0.8739076 |
| 20. William Stinehart, Jr., Trustee under Irrevocable Declaration of Trust dated 09/16/76 | 0.1747815 |
| 21. Patricia K. Stinehart, Trustee— Jacqueline Elaine Stinehart Trust | 0.1747815 |
| 22. Patricia K. Stinehart, Trustee under Irrevocable Declaration of Trust dated 07/09/76 | 0.1747815 |
| 23. Joan Marie Stinehart | 0.1747815 |
| 24. Richard Emerson Stinehart | 0.1747815 |

Appendix B

| SALE | No. 1 | No. 2 | No. 3 | No. 4 | No. 5 | No. 6 | No. 7 | No. 8 |
|---|---|---|---|---|---|---|---|---|
| $/Acre | $24,766 | $34,450 | $20,552 | $33,333 | $36,000 | $7,352 | $11,024 | $8,333 |
| Date Adj. | 11/81 +24% | 2/85 0% | 8/82 +18% | 9/82 +18% | 2/84 +6% | 1/84 +6% | 1/84 +6% | 6/86 +0% |
| Size Adj. | −16% | −25% | −25% | −25% | −25% | +20% | −15% | −15% |
| Location Adj. | 0% | 0% | 0% | 0% | 0% | +10% | +35% | +35% |
| Wetlands | −10% | −10% | −10% | −10% | −10% | +50% | −15% | 0% |
| Access | −25% | −25% | −25% | −25% | −25% | −25% | +15% | +15% |
| NET ADJMT | −27% | −60% | −42% | −42% | −54% | +61% | +26% | +35% |
| Indicated $/Acre | $18,079 | $13,780 | $11,920 | $19,333 | $16,560 | $11,837 | $13,890 | $11,250 |

Using all 8 sales
    Average per acre: $14,581
    Total for 80 acres: $1,166,490

Appendix C

Comparing industrial parcels without wetlands adjustment to 71 dry acres of Tract 301

| SALE | No. 1 | No. 2 | No. 3 | No. 4 | No. 5 |
|---|---|---|---|---|---|
| $/Acre | $24,766 | $34,450 | $20,552 | $33,333 | $36,000 |
| Date Adj. | 11/81 +24% | 2/85 0% | 8/82 +18% | 9/82 +18% | 2/84 +6% |
| Size Adj. | −16% | −25% | −25% | −25% | −25% |
| Location Adj. | 0% | 0% | 0% | 0% | 0% |
| Access | −25% | −25% | −25% | −25% | −25% |
| NET ADJMT | −17% | −50% | −32% | −32% | −44% |
| Indicated $/Acre | $20,556 | $17,225 | $13,975 | $22,666 | $20,160 |

Using all 5 sales
   Average price per acre: $18,916
   Total for 71 acres: $1,343,064

