Francis E. **HEYDT**, d/b/a Francis E. Heydt Company, and Commerce Industrial Development Corporation

v.

The **UNITED STATES**.

No. 92–307C.

United States Court of Federal Claims.

July 8, 1997.

---

Thomas J. McGeady, Vinita, OK, for plaintiffs. Robert Alan Rush, of counsel.

Harold D. Lester, Jr., Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Kathleen D. Hallam, Defense Personnel Support Center, of counsel.

## OPINION

YOCK, Judge.

This is an action for the recovery of the reasonable rental value of two facilities located in Idabel and Commerce, Oklahoma, and

used by the Federal Government to store military clothing and clothing parts for approximately twenty months. The plaintiffs in this action contend that they had an implied-in-fact contract with the Government for the storage costs of the Government's property, or in the alternative, that the Government took their property without just compensation in violation of the Fifth Amendment to the United States Constitution. Trial was held in this matter on August 20–23, 1996, and on September 4, 1996, in Tulsa, Oklahoma. Upon full consideration of the entire trial record, the Court finds that the plaintiffs partially prevail in this action under their alternative takings claim theory.

## Statement of the Facts

In March 1968, Mr. Heydt, as the lessee, executed a bond lease with the lessors, Idabel Industrial Development Authority (IIDA) and Kellwood Company (Kellwood),[1] for property and a facility located in Idabel, Oklahoma.[2] The bond lease was amended in September 1986.[3] D's Exs. 12–19. In January 1988, Mr. Heydt assigned his leasehold interest in the Idabel property to Sac & Fox Industries, Inc. (Sac & Fox), in anticipation of Sac & Fox's contract with the Federal Government for the manufacture of military chemical protective clothing. P's Exs. 31, 34; D's Ex. 4. The lease between Mr. Heydt and Sac & Fox contained no price term. Tr. at 527.[4]

In addition, on December 20, 1988, Sac & Fox leased property and a manufacturing facility in Commerce, Oklahoma, from the Commerce Industrial Development Corporation (CIDC), which was wholly owned by Mr. Heydt, D's Ex. 40 at A; Tr. at 214–15, in anticipation of its contract with the Government. P's Exs. 34, 36; D's Exs. 1–2.[5] The Commerce property lease was for a period of five years, December 31, 1988, through December 31, 1993. The lease payment terms were stated as follows:

> The lease amount shall be Five Thousand ($5,000.00) Dollars per month for the first month of the lease period through the twelfth month of the lease period, then increased to Ten Thousand ($10,000.00) Dollars per month for the thirteenth through the sixtieth month.

P's Ex. 36 at 2.

On July 19, 1989, Sac & Fox, CIDC, and Mr. Heydt executed a purchase agreement for the Commerce property that was dated July 1, 1989. P's Ex. 82; D's Ex. 8.[6] In addition to the Commerce facility, the purchase agreement included the equipment, inventory, experienced workforce, and the value of the business as a going concern. Tr. at 531–32.[7] The price terms of the Commerce purchase agreement were as follows:

> In consideration of SFI [Sac & Fox] being permitted to occupy the premises hereinabove referred SFI agrees to pay $45,000.00 per month beginning July 1, 1989, receipt of which is hereby acknowledged, and $45,000.00 on the 1st day of each month thereafter until December 31,

1. *See* D's Ex. 10 (Declaration of Trust of the IIDA); D's Ex. 11 (original lease between the IIDA, as lessor, and Kellwood, as lessee). The plaintiffs' trial exhibits will be designated at P's Ex. ___, and the defendant's trial exhibits will be designated as D's Ex. ___.

2. The original price of the lease was $27,387 per year, Tr. at 501, and was later decreased to $3,000 a year, *id.*, then to $2,000 a year, *id.* at 502, then, finally, to $1,000 a year, *id.* References to the trial transcript for August 20–23, 1996, are Tr. at ___, and the references to the trial transcript for September 4, 1996, are Tr. 2 at ___.

3. The lease was purchased from Kellwood for $200,000. Tr. at 502.

4. The parties also executed a "CONTRACT FOR PURCHASE OF ASSETS AND ASSIGNMENT AND ASSUMPTION" for the Idabel property. D's Exs. 5–6.

5. Sac & Fox also had possession of properties in two other locations in Oklahoma, Temple and Cushing, in anticipation of its contract with the Government that are not the subject of this litigation. Tr. at 419.

6. The purchase agreement covered the Commerce facility, as well as the warehouse building located diagonally across the street from the Commerce building, Tr. at 487, but, according to Mr. Heydt, Sac & Fox never occupied or used the warehouse, *id.* at 488–89.

7. The purchase agreement also contained a no-competition clause. *Id.* at 532.

1989, or when the full purchase price, to-wit: $3,000,010.00, is paid and the sale consummated, whichever event first occurs.

P's Ex. 82 at 1; D's Ex. 8 at 2.[8]

On or about November 28, 1989, the parties, Sac & Fox and Mr. Heydt, also entered into a lease extension [9] of the Commerce property. P's Ex. 33a at 1; D's Ex. 9 at 1. Under the terms of this lease extension, Sac & Fox agreed to purchase real and personal properties from Mr. Heydt for $3,000,010. *Id.* In addition, the lease extension called for lease payments to be increased from $5,000 per month to $45,000 per month and, subsequently, up to $80,000 per month. *Id.* at 2–3. The lease extension also contained various penalty provisions. *Id.* Sac & Fox, however, never paid Mr. Heydt $45,000 or $80,000 per month as stipulated by the purchase agreement and lease extension and never obtained title to the property. Tr. at 545–46.

In 1988, at the same time that Sac & Fox executed agreements for the Idabel and Commerce properties, the Government was conducting preaward surveys to determine if Sac & Fox was capable of performing the requirements of the Government's solicitation for the manufacture of military chemical protective suits. P's Exs. 32, 35, 37; D's Ex. 42. These surveys included an inspection of the Idabel and Commerce facilities that were owned by Mr. Heydt and leased to Sac & Fox. *Id.*; Tr. at 61. On or about March 10, 1989, the Government (through the Defense Personnel Support Center (DPSC)) entered into a contract with Sac & Fox, under which Sac & Fox agreed to manufacture and to sell to the Government approximately 499,000 military chemical protective suits.

In November 1990, however, the Sac & Fox contract was partially terminated for default because of Sac & Fox's failure to perform. *See* P's Exs. 46–47. Sometime in January 1991, Sac & Fox completely stopped production of the chemical protective suits. P's Exs. 41–43, 49; D's Ex. 47. In addition, Sac & Fox failed to make rent payments for its use of the Idabel and Commerce facilities owned by Mr. Heydt. P's Ex. 41; D's Exs. 44–45. As a result, in February 1991, Mr. Heydt took repossession of its Idabel and Commerce properties, D's Exs. 20–31, 95, changed the locks, and hired watchmen to guard the properties. P's Ex. 41; Tr. at 170–76.[10] In early 1991, when the Sac & Fox contract was terminated, and Sac & Fox was evicted from the Idabel and Commerce facilities; both facilities contained the Government's property, *i.e.*, the progress payment inventory that Sac & Fox used to make the chemical protective suits.

As a result of Sac & Fox's failure to perform the contract, on January 17, 1991, the Government made the following recommendation:

> The Administrative Contracting Officer recommends that the contract be terminated for default in lieu of extending the delivery schedule and increasing the Government's financial risk on a potentially bankrupt contractor. He also recommends the government take title to all progress payment inventory, remove it from Sac and Fox, and ship it to other Government suppliers of chemical protection suits. This will improve the supply posture and allow the Government to recoup unliquidated progress payments.

P's Ex. 44 at 3. On March 5, 1991, Ms. Kaye Deppe, the Procuring Contracting Officer (PCO) for the Sac & Fox contract, Tr. at 238–39, informed Sac & Fox of the Government's intention to terminate Sac & Fox for default. P's Ex. 40. Effective March 25,

---

**8.** After Sac & Fox agreed to purchase the Commerce property and facility, it entered into an agreement to lease the property back to Mr. Heydt. D's Ex. 3.

**9.** This lease extension was also known as a supplemental purchase agreement by the parties. Tr. at 542–43.

**10.** After Mr. Heydt took possession of his facilities, he had other manufacturers come into the Idabel facility and make floral pins and garments because, according to the Idabel lease, Mr. Heydt was required to maintain some minimum standard of production in the facility. Tr. at 143–44, 471–76. Specifically, in May 1991, Mr. Heydt's son, Tom Heydt, employed 125 people to manufacture dungarees and bathrobes in the Idabel facility until March 1, 1992, when the Idabel lease was sold and assigned to Hagale Industries. Tr. at 475–76, 614–15.

1991, the remainder of the Sac & Fox contract was terminated for default due to Sac & Fox's inability to meet the contract delivery schedule. P's Exs. 38–39; D's Ex. 48. On March 29, 1991, Sac & Fox requested that the DPSC (on behalf of the Government) consider Sac & Fox's plan to reinstate its contract. *See* D's Ex. 50. Pursuant to the Federal Acquisition Regulation (FAR), 48 C.F.R. § 49.401(e) (1990), the DPSC agreed to consider such a reinstatement after Sac & Fox submitted a viable and satisfactory business plan. *Id.*

Moreover, by letter dated April 3, 1991, Mr. Dan Wolfinger, the Administrative Contracting Officer (ACO) with the Defense Logistics Agency (DLA) in Oklahoma on the Sac & Fox contract, informed Mr. Ron Fixico, of Sac & Fox, that:

Sac and Fox Industries Ltd. no longer has the right to proceed with performance on this contract regardless of the disposition of your petition [for Writ of Prohibition and/or Mandamus to prevent Mr. Heydt from taking possession of his real property located in Idabel and Commerce, Oklahoma] by the Court. Further, all material and work in process inventory is the property of the Department of Defense and your firm can not [sic] remove or perform any work on this material pending its removal from your facilities. Should you elect to attempt to remove or tamper with any of this material to which the Government has acquired title by virtue of the Progress Payment clause,[11] we will take action through the Federal Courts or other appropriate agencies to prevent such interference.

P's Ex. 48. On April 9, 1991, Mr. Wolfinger requested disposition instructions from Ms. Deppe for the Government's property located in the Idabel and Commerce facilities. P's Ex. 20. By letters dated May 30, 1991, the Government solicited various companies to complete the quality in-process inventory remaining from Sac & Fox's partially completed contract. P's Exs. 55, 60–61, 80–81, 83–89; D's Exs. 53–55, 59, 64–65. However, in June 1991, at the same time that the DPSC was considering bids for other entities to complete the Sac & Fox contract, the DPSC was also still considering Sac & Fox's reinstatement, D's Exs. 57–58. On June 26, 1991, representatives of DPSC and Sac & Fox met to discuss the reinstatement of the latter's contract. P's Ex. 57; D's Ex. 58.

In June 1991, some three months after the Government terminated the Sac & Fox contract, the Government's property still remained in the Idabel and Commerce facilities. By letter dated June 18, 1991, to Mr. Wolfinger, Mr. George Walters, Mr. Heydt's attorney, informed the Government that it was responsible for rent for the presence of the Government's property in the Commerce and Idabel facilities and must post a cash cleaning bond. The letter stated:

I represent Francis Heydt, Inc., who leased certain buildings and equipment to Sac & Fox Industries, Ltd. Sac & Fox Ltd. had a contract with the government.

The contract of the Defense Personnel Center (DPSC), Philadelphia, Pa. with the Sac & Fox Industries, Ltd. for Charcoal lines Chemical Protective Suits was completely cancelled by DPSC on March 22, 1991.

Before that date, March 22, 1991, my client looked to Sac & Fox for rental payment for the facilities utilized by Sac & Fox at Commerce, Oklahoma and Idabel, Oklahoma.

Since that date, March 22, 1991, my client must look to DPSC [the Government] for rental payments for those facilities.

This letter is notice that rent for the facilities in Idabel, Oklahoma and Commerce, Oklahoma for period of March 22,

---

11. The Progress Payment clause stated, in part, that:

 (d) *TITLE.*

 (1) Title to the property described in this paragraph (d) shall vest in the Government. Investiture shall be immediately upon the date of this contract, for property acquired or produced before that date. Otherwise, investiture shall occur when the property is or should have been allocable or properly chargeable to this contract.

D's Ex. 43 at 189. By use of this clause, the Government could have removed its property from the Idabel and Commerce facilities immediately after it terminated the contract. Tr. at 66.

1991 until April 21, 1991 and for the period of April 22, 1991 until May 21, 1991 is now due and owing. Further the rent is accruing at the rate of $80,000.00 per month as per the terms of the Sac & Fox lease, as long as the government property remains at the Idabel and Commerce, Oklahoma facilities.

Additionally, be advised that before the government removes any government property from those facilities a cash bond will have to be posted in sufficient strength to completely clean the facilities from the residual charcoal particles that will remain after all of the government property has been removed.

A copy of the Sac & Fox lease is available for your inspection.

P's Ex. 1; D's Ex. 56.

In addition, on July 30, 1991, Mr. Walters made a written demand to Mr. Wolfinger for the Government to remove its property. P's Ex. 2; D's Ex. 60. On that same date, Mr. Walters sent another letter to Mr. Wolfinger informing him that the Government was responsible for the rent which had accrued in the amount of $320,000. P's Ex. 3; D's Ex. 61. By memorandum dated August 1, 1991, Mr. Wolfinger forwarded Mr. Walters' letters to Ms. Deppe. P's Ex. 5; D's Ex. 63. In addition, on August 1, 1991, Mr. Wolfinger responded to Mr. Walters' letters and stated that "[y]our letters of 30 July 1991 demanding removal of Government Property and rental charges for subject contractor's facilities have been forwarded to the Procuring Contracting Officer, Ms. Kay Deppe, for action. You should be hearing from her in the near future." P's Ex. 4; D's Ex. 62.[12]

In August 1991, Ms. Deppe made the decision not to reinstate the Sac & Fox contract, and on August 22, 1991, Ms. Deppe issued disposition instructions for the Government's property that was located in the Commerce and Idabel facilities. P's Ex. 6; D's Ex. 67. By an August 30, 1991 memorandum, Mr. Wolfinger informed Ms. Deppe that she needed to contact a plant clearance officer

(Ms. Patrecia Sarubbi) to effect the disposition of the Government's property. P's Ex. 8. In the meantime, Mr. Walters sent another letter, dated August 26, 1991, to Mr. Wolfinger that informed the Government that rent was still accruing and that Mr. Heydt was asserting a storage lien against the Government's property.

I am again writing to you concerning the demand by my client, Francis Heydt, Inc., for the removal of all property belonging to the government at Mr. Heydt's facilities at Commerce, Oklahoma and Idabel, Oklahoma.

These items have not been removed and still remain on the premises. In addition, Mr. Heydt is asserting a storage lien against the said personal property for past due rentals. These rentals now extend for five months at $80,000.00 each month or a total of $400,000.00.

Please contact Mr. Heydt concerning the matter as soon as possible. P's Ex. 7; D's Ex. 68.[13] By memorandum dated September 5, 1991, Ms. Deppe gave Mr. Wolfinger more detailed disposition instructions regarding all of the Government's property located in Mr. Heydt's facilities. Essentially, all of the Government-owned property was to be removed from the Idabel and Commerce facilities. P's Ex. 15; D's Ex. 70.

On September 7, 1991, approximately six months after the Sac & Fox contract was terminated, Mr. Heydt personally wrote to Mr. Wolfinger as follows:

In an effort to help you remove, or have removed, the government property now being stored on the premises at Commerce, Oklahoma and Idabel, Oklahoma since March 23, 1991, please consider this letter as a formal and final offer on my part.

I will pay $100,000.00 cash for all the inventory, work-in-process, findings, etc. remaining on the above premises and that part of the property of the contract remaining in the Cushing, Oklahoma factory,

---

**12.** Ms. Deppe never personally contacted Mr. Walters or Mr. Heydt, Tr. at 266, and Mr. Walters never attempted to contact Ms. Deppe. Tr. at 183–84.

**13.** Mr. Wolfinger apparently forwarded the August 26, 1991 letter to Ms. Deppe via a memorandum dated August 30, 1991. P's Ex. 8; D's Ex. 69.

together with a complete release to the government, the Defense Department or whomever else is concerned for any and all damages, debts, or other liabilities the government or Defense Personnel Support Center or other concerned may have together with all interest charges todate [sic] and any and all other costs relating to the clean-up and removal of all charcoal dust resulting from the manufacture of the Chemical Protective suits previously contracted by the Department of Defense to the Sac and Fox Industries, Ltd., Stroud, Oklahoma.

This offer is contingent upon your immediate acceptance and becomes absolutely null and void close of business, Friday, September 13, 1991.

P's Ex. 10; D's Ex. 71.

However, by letter dated September 10, 1991, Mr. Heydt returned to his previous position of demanding payment for all storage charges and requiring a cleaning bond before the Government could remove its property in the event that the Government refused to accept Mr. Heydt's September 7, 1991 offer. The letter stated in pertinent part:

1. Neither you nor any of your officers nor any employees of the Department of Defense or its agency the Defense Personnel Center nor anyone connected with any of the above parties are to enter upon either property in Commerce, Oklahoma or Idabel, until such time as you have secured from me a complete release showing that you or the people your office represents have paid in full all storage charges together with accumulated interest todate [sic], all legal charges accumulated todate [sic] and a bond in an amount sufficient to clean the factory of all charcoal residual [sic].

P's Ex. 11; D's Ex. 73.[14]

By letter dated September 9, 1991, Ms. Deppe formally notified Sac & Fox that its proposal for the reinstatement of its contract was not acceptable, and, thus, the DPSC would not reinstate the contract. D's Ex. 72. In addition, sometime during September

1991, Mr. Wolfinger contacted Mr. Heydt regarding the removal of the Government's property. Mr. Heydt verbally informed Mr. Wolfinger that the Government could not remove its property until Mr. Heydt's claim for storage costs was settled. P's Ex. 9; D's Ex. 74.

By letter dated September 23, 1991, Mr. Heydt again informed Mr. Wolfinger that the Government could not remove its property without Mr. Heydt's permission. The letter stated:

This letter is notice that rent for the facilities in Idabel, Oklahoma and Commerce, Oklahoma for the period from March 22, 1991 through September 22, 1991 is now due and owing in the amount of $480,-000.00.

This letter is further a demand for you to remove the property from the premises as soon as practical.

Under no circumstances are you to enter on the property; neither you or any personnel from your office or the Department of Defense until you have first notified me and obtained my permission.

P's Ex. 12; D's Ex. 75. However, in September or October 1991, Mr. Heydt did allow the Government to remove approximately 6100 completed chemical protective suits from Mr. Heydt's facilities for use in Operation Desert Storm. *See* P's Ex. 21; D's Ex. 76. Nevertheless, by letters dated October 24, 1991, November 25, 1991, December 24, 1991, January 22, 1992, and February 24, 1992, Mr. Heydt repeated his demand for rent, which was increasing by $80,000 each month, and repeated his demand that the Government could not enter Mr. Heydt's facilities to remove its property "until you [the Government] have first notified me and obtained my permission." P's Exs. 13–14, 16–17, 29; D's Exs. 77–79, 83, 91. By memorandum dated September 23, 1992, Ms. Deppe requested Mr. Wolfinger to "[i]nitiate legal action to remove the Government Progress Payment Inventory from the Plants." P's Ex. 21.

14. *Via a September 12, 1991 memorandum, Mr. Wolfinger notified Ms. Marianne Campbell, Ms.* Deppe's assistant, of Mr. Heydt's September 7 and 10, 1991 letters. P's Ex. 9; D's Ex. 74.

By memorandum dated January 22, 1992, Mr. Wolfinger notified Ms. Deppe that Mr. Heydt intended to file a "Claim of Lien on Personal Property for Storage and Foreclosure Thereof," and that the Government could lose the property through a sheriff's sale, if no action was taken to remove the property and or to negotiate the cost of storage of the property. P's Ex. 23; *see also* D's Exs. 80–81. By memorandum dated January 22, 1992, Ms. Deppe instructed Mr. Wolfinger to "initiate all necessary action to remove the remaining progress payment inventory" from Mr. Heydt's facilities. P's Ex. 26; D's Ex. 84; *see also* P's Exs. 27, 77; D's Ex. 89. On January 30, 1992, Mr. Wolfinger notified Mr. Heydt of the Government's intention to remove its property, despite Mr. Heydt's contention that the Government owed him storage costs and a cleaning bond. P's Ex. 71; D's Ex. 87. Specifically, the letter stated that:

> It is our intention to remove Government Property, resulting from Progress Payment Inventory on Contract DLA 100–89–C–0378 from your plants located in Commerce and Idabel, Oklahoma. Although you have stated that you refuse to allow removal of this property without payment of storage costs, it is our position that these are two separate issues. The Government has title to the property and it can not [sic] be held hostage pending resolution by the Procuring Contracting Officer (PCO) of your claim for storage costs. Consequently, we intend to begin removal of the property in approximately three weeks and we expect it will take approximately ten days to complete. Request you advise the undersigned by 6 February 1992 of your concurrence in this action as well as points of contact for entrance to the facilities.

P's Ex. 18; D's Ex. 85. Mr. Heydt responded to Mr. Wolfinger's January 30, 1992 letter by telephone stating that he would not allow the Government to remove its property and that he was posting armed guards at the facilities to prevent the Government's removal of its progress-payment inventory. P's Ex. 71; D's Ex. 87; Tr. at 131, 292, 301.

In January 1992, Mr. Heydt filed a storage lien in Ottawa County against the Government's property located in his facilities in Commerce. P's Ex. 23; D's Ex. 81. In response to that claim of lien, the Government filed a federal action for injunction against Mr. Heydt to keep him from selling the Government's property. D's Ex. 86. By Order dated March 26, 1992, the United States District Court for the Northern District of Oklahoma (the district court) ordered Mr. Heydt to allow the Government to remove its property from his facilities. P's Ex. 30 at 4; D's Ex. 94 at 4.

In the meantime, on February 13, 1992, Mr. Heydt and the CIDC assigned all of their interests in the lease for the Idabel facility to Hagale Industries, Inc. (Hagale). P's Ex. 102; D's Exs. 32, 35. In addition, Mr. Heydt and CIDC sold 300 (later decreased to 250) pieces of equipment that were located in the facility to Hagale. P's Ex. 102 at 2, 7; D's Ex. 32 at 2, 7. As consideration for the assignment of the lease, Hagale agreed to pay Mr. Heydt and CIDC six thousand ($6,000) dollars per month, *id.* at 2, D's Ex. 38, subject to certain adjustments in the event Mr. Heydt and CIDC were not able to deliver all of the equipment, P's Ex. 102 at 8; D's Ex. 32 at 8. The assignment of the lease and sale of equipment were effective March 1, 1992, *id.* at 2, and Hagale's employees were present in the facilities on March 2, 1992, Tr. at 646. By an addendum dated May 28, 1994, Hagale's monthly payment was reduced from $6,000 to $3,000. D's Ex. 33; Tr. at 650–52.

During the time period that Mr. Heydt had filed a storage lien against the Government property in Commerce and had sold his interest in the Idabel property, the Government was attempting to remove its property from the two facilities at Idabel and Commerce. Specifically, on February 12, 1992, Mr. Wolfinger contacted Ms. Patrecia Sarubbi, Chief of the Contract Property Management and Disposal Branch of the DLA, regarding the disposition instructions for the Government's property. P's Ex. 28; D's Ex. 90; Tr. at 392.[15] Ms. Sarubbi then requested

---

15. Ms. Sarubbi had already conducted invento-   ries of the Government's property at the Idabel

funds for the removal and transportation of the progress payment inventory from Mr. Heydt's Idabel facility. P's Exs. 50, 72–73; *see also* P's Ex. 52. Ms. Sarubbi was not given the approval to remove the Government's property from the Idabel and Commerce facilities until April 1992, because the Government did not have access to the facilities until March 26, 1992. Tr. at 293–94, 396, 421. Ms. Sarubbi could not do both facilities at the same time because of funding and personnel problems, Tr. at 398–99,[16] so, at the request of Mr. Heydt, the Government's property was removed from Idabel first. *Id.* at 397. On September 17, 1992, Ms. Sarubbi informed Mr. Heydt that all of the Government's property had been removed from the Idabel facility.

> This letter constitutes notification that all the Government property located at the Idabel, Oklahoma facility from the Sac and Fox Government contract has been removed effective September 17, 1992.

P's Exs. 19, 51; D's Ex. 96.

However, in September 1992, the Government's property located in the Commerce facility had not been removed. In fact, Mr. Heydt wrote to Mr. Wolfinger on October 26, 1992, regarding the delay in removing the Government's property from the Commerce facility. The letter stated in pertinent part:

> Seven months have now passed since Judge Ellison issued his judgement [sic] dated March 26, 1992. In that judgement [sic], Judge Ellison ruled the material being stored in our factory buildings belonged to the U.S. Government.
>
> Since that judgement [sic] letter of March 26, 1992, we have been visited by a team of government disposal experts and later by a trucking concern that desired to submit a bid for removing the government goods from the premises. The truck concern has contacted us several times to discuss additional details about the contents and it is our understanding that the trucking concern has been issued a contract to move the material being stored in the Commerce facility. We received a letter dated September 17, 1992 from Patrecia Sarubbi, Chief Contract Property Management and Disposal Branch, that the material in the Idabel facility had finally been completely removed.
>
> We have tried to be cooperative but there is no sign of activity on the part of the government that anything positive is being done to vacate the Commerce facility.
>
> The matter has long since passed being absurd. We have had numerous opportunities to show the Commerce premises to prospective buyers but the government goods being stored there is a firm barrier to anyone's positive thinking about buying or renting the property.
>
> With this letter I am again strongly requesting that the government expedite the removal of the goods from our Commerce facility as soon as possible.
>
> It has now been 21 months since we have had possession of our factories. P's Ex. 94.

In the meantime, CIDC was unable to make the mortgage payments on the Commerce property. In lieu of foreclosure, on or about September 17, 1992, CIDC executed and delivered a warranty deed to Security Bank of Kansas (Security Bank), the mortgagee, for the Commerce property. D's Ex. 39 at 2.[17]

Finally, in November 1992, Ms. Sarubbi requested and received funds for the removal and transportation of the Government's property located at the Commerce facility, P's Exs. 67–68, 95, 100; D's Exs. 97–101, and solicited bids for such removal and transportation, P's Exs. 69–70; *see also* P's Exs. 93, 96. Ms. Edna Shaw, a property disposal officer for the Government, arrived at Mr. Heydt's Commerce facility on February 1, 1993, to begin packing and transporting the Government's property from Mr. Heydt's facility to other locations. *See* P's Exs. 98–99;

and Commerce facilities in December 1990, when *Sac & Fox was not able to meet production deadlines. P's Exs. 91–92; D's Ex. 82; Tr. at 393.*

**16.** Ms. Deppe, however, knew of no funding problems. Tr. at 335.

**17.** By the conveyance of the Commerce property, Security Bank gave CIDC $1 million credit on its mortgage with Security Bank. Tr. 2 at 6.

D's Ex. 102.[18] The Government's property was completely removed from the Commerce facility by February 10 or 11, 1993. P's Ex. 98; Tr. at 691.[19]

On April 28, 1992, Mr. Heydt, d/b/a Francis E. Heydt Company, filed an action against the Government in this Court setting forth two counts for recovery. In Count I of the Complaint, the plaintiff claimed an implied-in-fact contract with the Government. Count I states in pertinent part that:

> [t]he Government owes and is liable to Heydt for its use and occupation of Heydt's facilities, and has agreed to pay, by virtue of its continued use and occupancy of Heydt's facilities after receiving notification of the payments accruing thereon and of Heydt's intention to hold the Government responsible therefor, the reasonable amount of ONE MILLION FORTY THOUSAND DOLLARS ($1,040,000.00), together with rental accruing at the rate of EIGHTY THOUSAND DOLLARS ($80,-000.00) per month from April, 1992 until such time as the Government vacates Heydt's facilities.

Compl. at 4. In Count II of the Complaint, the plaintiff claimed, in the alternative, that he was entitled to "recover the reasonable rental for the Government's deprivation of Heydt's property * * * as just compensation for property taken by the Government." *Id.*

On January 31, 1994, the defendant moved to dismiss the plaintiff's Complaint or, in the alternative, for summary judgment. This Court denied the Government's motions on March 14, 1995, and ordered the case to trial. As earlier indicated, a trial was held in this matter on August 20–23, 1996, and on September 4, 1996, in Tulsa, Oklahoma.

18. Ms. Shaw had previously visited the Commerce facility in November 1992 to determine what equipment she would need to remove the Government's property. Tr. at 684.

19. The Government's property from the Idabel and Commerce facilities were transported to various federal agencies, state governments, and other entities. Tr. at 401–02.

20. In its post-trial brief, the Government claims that Mr. Heydt originally claimed that he had an

*Discussion*

**A. Implied-In-Fact Contract [20]**

In Count I of their Complaint, the plaintiffs contend that they had an implied-in-fact contract with the Government for the storage of the Government's property in the plaintiffs' Idabel and Commerce facilities from March 1991 through December 1992. Specifically, Mr. Heydt contends that he made an offer for the Government to store its property in his facilities. Further, Mr. Heydt alleges that the Government affirmatively acknowledged and accepted his offer by using his facilities to store its property after Mr. Heydt had demanded the removal of the property. Moreover, the plaintiffs argue that Mr. Heydt and the Government "mutually intended to enter into a contract for the use of Heydt's facilities for $80,000 per month." P's Post–Trial Brief at 16. Finally, the plaintiffs allege that it is undisputed that Ms. Kaye Deppe, the Government's agent whose conduct Mr. Heydt relied upon, had the actual authority to bind the Government for its use of Mr. Heydt's facilities.

In response to the plaintiffs' contentions, the Government denies that the parties had an implied-in-fact contract to pay the plaintiffs $80,000 per month for the use of the Idabel and Commerce facilities. Specifically, the Government contends that Mr. Heydt did not offer to contract with the Government but simply demanded the payment of rent from the Government. In addition, the defendant argues that the Government never accepted any offer to store its property at Mr. Heydt's facilities nor did it agree to any of the payment conditions in the alleged offer that Mr. Heydt insisted on imposing. Finally, the Government argues that the evidence demonstrates that there was no mutual intent to contract and that the Government

express contract with the Government, but later abandoned that claim. D's Post–Trial Brief at 33. At trial, Mr. Heydt specifically stated that he has no claim based on Sac & Fox's express contract with the Government but a claim based on an implied-in-fact contract. Tr. at 548–49. In any event, the facts indicate that the plaintiffs have no factual or legal basis for a claim of express contract.

always sought to remove its property from Mr. Heydt's facilities.

■ To prove an implied-in-fact contract with the Government, a plaintiff must establish the same contractual elements that are required to prove an express contract: (1) offer, (2) acceptance, (3) mutual intent to contract, (4) consideration, and (5) a showing that the Government agent, whose conduct is relied upon, had the actual authority to bind the Government. *E.g., Mega Constr. Co. v. United States,* 29 Fed. Cl. 396, 469 (1993); *Alde, S.A. v. United States,* 28 Fed. Cl. 26, 30 (1993); *LaChance v. United States,* 15 Cl.Ct. 127, 130 (1988). Unlike an express contract, however, which is created by an explicit agreement of the parties, an implied-in-fact contract can be inferred from the conduct of the parties. *Insurance Co. of N. Am. v. United States,* 11 Cl.Ct. 1, 3 (1986).

■ In this case, the plaintiffs fail to meet any of the contractual requirements to establish an implied-in-fact contract with the Government for the storage of its property in Mr. Heydt's facilities.

■ First, the facts of this case do not support the plaintiffs' contention that Mr. Heydt made an unambiguous and unconditional offer to the Government regarding the storage of the Government's property. An offer to contract is " 'the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.' " *Lucas v. United States,* 25 Cl.Ct. 298, 304 (1992) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 24 (1981)). The offer to contract must be definitive, *Singleton v. United States,* 6 Cl.Ct. 156, 166 (1984), and the party asserting the existence of an implied-in-fact contract must show evidence from which a "promise, representation, statement, or assertion" of a willingness to enter into a contract may be inferred, *LaChance,* 15 Cl.Ct. at 130.

■ In this case, Mr. Heydt, personally and through his attorneys, sent several letters to Mr. Wolfinger, the first one dated June 18, 1991.[21] These letters *demanded* storage costs from the Government for the storage of its property in Mr. Heydt's facilities. These letters also demanded that storage costs, as well as a cash bond for the cleaning of the facilities, be paid *before* the Government would be permitted to remove its property.[22] In fact, Mr. Heydt testified at trial that he meant that the Government could not take its property without first paying the storage costs and posting a cash cleaning bond. Specifically, Mr. Heydt testified on cross-examination at trial that, according to Mr. Walter's June 18, 1991 letter to Mr. Wolfinger, the Government was required to post a cash bond before removing its property from Mr. Heydt's facilities.

Q Okay. And that paragraph [regarding the posting of a cash bond in Mr. Walter's June 18, 1991 letter] means what it says, right?

A It means exactly what it says.

Q And it means that the Government could not remove anything at this time until it posted a cash bond.

A Yes, sir.

Tr. at 553.

In addition, on cross-examination, Mr. Heydt testified that his September 10, 1991 letter to Mr. Wolfinger meant the same thing.

---

21. In his claim for an implied-in-fact contract, Mr. Heydt seeks rents beginning in March 1991, when the Sac & Fox contract was terminated, and the Government, therefore, began to occupy and use the facilities. However, as Mr. Heydt admitted, he sent his first "offer" to the Government on June 18, 1991. *See* P's Post–Trial Brief at 11. Without an offer, no implied-in-fact contract could exist from March 1991 to June 18, 1991. *See Alde S.A.,* 28 Fed. Cl. at 30. That the Government knew that Mr. Heydt had evicted Sac & Fox from his facilities in February 1991 does not change the fact that, prior to June 18, 1991, Mr. Heydt did not offer to contract with

the Government. Therefore, if the parties did enter into an implied-in-fact contract, that contract did not exist until June 18, 1991, at the earliest, when the first "offer" was made. As demonstrated below, however, this Court finds that Mr. Heydt never made any offer to contract.

22. Under the Sac & Fox contract, however, the Government did not have the obligation to pay rent to Mr. Heydt, to clean the facilities used by Sac & Fox, or to post a cash cleaning bond. Tr. at 100.

Q And in there[, the September 10, 1991 letter] you are saying that the Government cannot come in and remove its property at least until it had paid all storage costs, all legal charges and cleaning bond, right?

A Yes, sir.

Q And that is what you meant?

A And what?

Q And that is what you meant, right? You meant that.

A Yes, I meant it. That's exactly what I wrote.

Q They could not come in and take the stuff, right?

A No, sir.

Tr. at 558.

Moreover, although the plaintiffs' counsel suggested at trial that Mr. Heydt's six letters dated from September 23, 1991, through February 24, 1992, that informed the Government that it could not remove its property "until you [the Government] have first notified me and obtained my permission," merely required the Government to seek Mr. Heydt's permission and it would be granted, testimony at the trial, however, demonstrated to the contrary. Mr. Wolfinger and Ms. Deppe testified at trial that Mr. Heydt would not permit the Government to remove its property until all the claims for storage and cleaning were settled. Tr. at 109–10, 116–17, 281, 291–93, 335–36, 340–41. Even more indicative of Mr. Heydt's intent is his own testimony that the Government could not take its property without condition.

Q But throughout that period of time prior to that injunction [on March 26, 1992], you never informed the Government that it could just come in and take all the stuff without condition, right?

A I'm not sure. The letters speak for themselves.

Q And, through those letters, you meant that the Government could not come in and remove the inventory other than those 6,100 suits, until they had paid you the storage costs.

A Yes, sir.

Q And the cleaning bond.

A Yes, sir.

Tr. at 563; *see also* Tr. at 559. These facts demonstrate that the Government's "assent to [Mr. Heydt's] bargain [was *not* ] invited," *see Lucas*, 25 Cl.Ct. at 304 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 24), but it was *demanded* that the Government remove its property *after* it paid all storage costs and posted a cash cleaning bond. Tr. at 330.

In addition, Mr. Heydt's statement to Mr. Wolfinger that he was placing armed guards at the facilities to prevent the Government's removal of its property, Tr. at 131, 292, 301, does not indicate Mr. Heydt's "*willingness* to enter" into a contract, *see Lucas*, 25 Cl.Ct. at 304 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 24) (emphasis added). Therefore, the plaintiffs have not satisfied their burden to demonstrate that Mr. Heydt made an unambiguous and unconditional offer to contract with the Government for the storage of its property in Mr. Heydt's facilities. *See Town of Floyd v. United States*, 34 Fed. Cl. 170, 173 (1995), *aff'd*, 98 F.3d 1359 (Fed.Cir. 1996).

▪ Second, the Government never accepted any offer to enter into a contract with Mr. Heydt. "An offer is accepted by 'manifestation of assent to the terms thereof made by the offeree in a manner invited by the offer.'" *Lucas*, 25 Cl.Ct. at 304 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 50 (1981)). "It is essential * * * that the acceptance of an offer be manifested by conduct that indicates assent to the proposed bargain." *Pacific Gas & Elec. Co. v. United States*, 3 Cl.Ct. 329, 339 (1983), *aff'd*, 738 F.2d 452 (Fed.Cir.1984). Such an acceptance must be voluntary, *Lucas*, 25 Cl.Ct. at 304, and unconditional by the offeree, *Singleton*, 6 Cl.Ct. at 166.

▪ The Government's conduct, during the time period that its property was present in Mr. Heydt's facilities, does not constitute an acceptance of Mr. Heydt's so-called offers to store its property at his facilities sufficient to demonstrate an implied-in-fact contract. Upon the receipt of Mr. Heydt's letters. Mr. Wolfinger simply forwarded, or related the contents of, them to Ms. Deppe. Neither Mr. Wolfinger nor Ms. Deppe ever affirma-

tively conveyed to Mr. Heydt that the Government sought to store its property in Mr. Heydt's facilities. The Government's silence, or lack of response, cannot constitute an acceptance of Mr. Heydt's demands for payment. *See Operational Manuals, Inc. v. United States*, 205 Ct.Cl. 854, 855, 506 F.2d 1406 (1974).

■ In addition, at trial Mr. Heydt sought to demonstrate that the Government accepted his offer when Ms. Deppe wrote, in an internal memorandum, that "the Government is being assessed rental fees at $80,-000.00 per month. The inventory must be moved as quickly as possible to avoid any additional costs." P's Ex. 66. However, as Ms. Deppe testified, neither this memorandum, nor its contents, were ever articulated to Mr. Heydt, and it was not intended that he rely on any representations contained therein. Tr. at 328–29. Therefore, there was no "objective manifestation" to Mr. Heydt of the Government's intent to lease Mr. Heydt's facilities in which to store its property that would demonstrate that the Government accepted Mr. Heydt's offer. *See Ransom v. United States*, 900 F.2d 242, 244–45 (Fed.Cir. 1990).[23]

Moreover, the Government never recognized the validity of Mr. Heydt's demands. *Mega Constr. Co.*, 29 Fed. Cl. at 470. In fact, there was no intent by the Government to leave its property in Mr. Heydt's facilities.

In April 1991, less than one month after Sac & Fox's termination for default, Ms. Deppe issued the first set of disposition instructions for the Government's property, but, until March 26, 1992, was prevented from removing the property by Mr. Heydt's refusal to give the Government access to his facilities until it paid storage costs and posted a cash bond for the cleaning of the facilities.[24] Therefore, no facts presented by the parties indicate a promise, representation, or statement by any authorized Government agent to Mr. Heydt that the Government would pay Mr. Heydt for the storage of its property. *See LaChance*, 15 Cl.Ct. at 130; *Insurance Co. of N. Am.*, 11 Cl.Ct. at 4; *Essen Mall Props. v. United States*, 21 Cl.Ct. 430, 443 (1990).

■ Third, there was no mutual intent by the parties to enter into a contract. As this Court previously found, "[t]he mere conferring of a benefit on the government does not create an implied-in-fact contractual relationship. Implied-in-fact contracts require conduct of the parties manifesting assent." *Chavez v. United States*, 18 Cl.Ct. 540, 545 (1989).[25]

■ Mere knowledge by the Government's agents that the Government's property was present at Mr. Heydt's facilities and that the Government had received demands for payment of storage costs from Mr. Heydt do not show a mutual intent to enter into a

---

**23.** The plaintiffs also contend that the Government stored its property in Mr. Heydt's facilities because it "was in desperate need of chemical protective suits and, therefore, wanted to consider reinstatement of the Sac & Fox Contract * * *." P's Post–Trial Brief at 9. Ms. Deppe testified at trial, however, that she was "required to give [Sac & Fox's request for reinstatement] full consideration once the contract is terminated for default * * *[, that she] would be remiss as a contracting officer not to consider all options in order to mitigate the Government's damages," and that the Government's implied duty of good faith and fair dealing required her to consider the request for reinstatement. Tr. at 322.

**24.** The plaintiffs contend that the Government made the business decision to leave its property in Mr. Heydt's facilities because there was no alternative storage location and the transportation of the property to another location was prohibitive. P's Post–Trial Brief at 13–14. While Ms. Sarubbi testified at trial that there was

no *Government* facility nearby, she did not testify that there were no other *commercial* storage facilities in the area. Tr. 450–51. In any event, Mr. Heydt prevented the Government from removing its property.

**25.** The plaintiffs contend that Mr. Heydt and the Government had an executed contract under which the Government received a benefit; therefore, the Government is liable for the value of the benefit received. P's Post–Trial Brief at 18–19. As discussed below, however, this Court finds that there is no contract between the parties— either executed or executory—and the fact that the Government may or may not have received a benefit is irrelevant. *See Chavez*, 18 Cl.Ct. at 545. The plaintiffs' argument is more in tune with the concept of implied-in-law contracts— contracts over which this Court has no jurisdiction. *See Contel of Cal., Inc. v. United States*, 37 Fed. Cl. 68, 74 (1996); *Janowsky v. United States*, 36 Fed. Cl. 148, 152 (1996).

contract for the storage of the Government's property. *See* Tr. at 310; *see also Alliance of Descendants of Tex., Land Grants v. United States*, 37 F.3d 1478, 1483 (Fed.Cir.1994); *Operational Manuals, Inc.*, 205 Ct.Cl. at 855. In fact, throughout the time that the Government's property was present in Mr. Heydt's facilities, the Government had sought permission from Mr. Heydt to remove its property, but up until the time of the March 26, 1992 injunction order by the district court that permitted the Government to remove its property, Mr. Heydt had refused to allow the Government access to his facilities without the payment of the storage costs and a cleaning bond. *See Operational Manuals, Inc.*, 205 Ct. Cl. at 856; *Algonac Mfg. Co. v. United States*, 192 Ct.Cl. 649, 677, 428 F.2d 1241, 1257 (1970); *see also Essen Mall Props.*, 21 Cl.Ct. at 443 (finding no implied-in-fact contract where there are conditions still outstanding).[26]

In addition, no facts indicate "an approach, consultation, or negotiations" between Mr. Heydt and the Government regarding the storage of the Government's property in Mr. Heydt's facilities. *See Pasco Enters. v. United States*, 13 Cl.Ct. 302, 306 (1987); *see also Garza v. United States*, 34 Fed. Cl. 1, 15 (1995). To the contrary, Mr. Wolfinger received Mr. Heydt's demands for storage costs and the posting of a cash bond and simply forwarded, or related the contents of, those letters to Ms. Deppe. Mr. Wolfinger only contacted Mr. Heydt to inform him that his letters were being sent to Ms. Deppe and to inform him that the Government intended to remove its property despite Mr. Heydt's objections to such removal. Neither Mr. Wolfinger nor Ms. Deppe discussed or negotiated the storage of the Government's property with Mr. Heydt.

Moreover, the Government never acceded to, or recognized the validity of, Mr. Heydt's demands for the payment of storage costs or the posting of a cash cleaning bond. *See Chavez*, 18 Cl.Ct. at 545. At trial, the plaintiffs attempted to prove the Government's liability for storage costs based on a memorandum from the DLA's counsel to the DPSC's counsel that stated that "it appears that [Mr. Heydt] is entitled to such [storage] costs," P's Ex. 22, as well as the fact that the DPSC's counsel disagreed with the opinion of the DLA's counsel regarding Mr. Heydt's entitlement to payment, Tr. at 275. To the contrary, such disagreement between the DLA and the DPSC regarding Mr. Heydt's entitlement to storage costs demonstrates that there was no concrete decision or intent by the Government to enter into a contract with Mr. Heydt for the storage of the Government's property. *See In re Penn Central Transp. Co.*, 831 F.2d 1221, 1228–29 (3d Cir. 1987). In addition, there is no evidence to demonstrate that the DLA's counsel, who stated that it appeared that Mr. Heydt was entitled to payment, had the actual authority to bind the Government. *See*, discussion, *infra* at 30–31.

Also, the fact that Mr. Heydt, an experienced Government contractor, Tr. at 208, 484–85, knew or should have known that additional approvals were necessary and that entering into a contract with the Government required more steps than merely submitting a demand for storage costs to the Government demonstrates that there was no mutual assent by the parties to enter into a contract. *See* Tr. at 307–12, 344, 370; *see also OAO Corp. v. United States*, 17 Cl.Ct. 91, 100 (1989). Under these circumstances, the requisite mutual assent is lacking, and there can be no implied-in-fact contract. *See Riggleman v. United States*, 215 Ct.Cl. 865, 868–69, 566 F.2d 1190 (1977); *Operational Manuals, Inc.*, 205 Ct. Cl. at 855–56; *Essen Mall Props.*, 21 Cl.Ct. at 443.[27]

▮▮▮ Finally, there is no implied-in-fact contract because the Government agent

---

26. The plaintiffs contend that the Government made a business decision to keep its property in Mr. Heydt's facilities. P's Post–Trial Brief at 16. The fact is, however, that Mr. Heydt refused to allow the Government to remove its property without condition.

27. While the parties and this Court did not specifically address whether or not Mr. Hedyt's alleged implied-in-fact contract was supported by consideration, this Court finds that it is not necessary to do so in light of the fact that the plaintiffs have failed to meet all of the other requirements necessary for an implied-in-fact contract.

on whose conduct Mr. Heydt relied during the time period that the Government's property was located at his facilities, did not have the actual authority to bind the Government. As the Supreme Court found:

> Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority.

*Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *see also Shearin v. United States*, 25 Cl.Ct. 294, 297–98, *aff'd*, 983 F.2d 1085 (Fed.Cir. 1992).

Any perceived contract between Mr. Heydt and the Government was not binding upon the Government because it was made without the actual authority to bind the Government. Although the plaintiffs contend in their briefs that Ms. Deppe was the contracting officer whose conduct they relied on, P's Post–Trial Brief at 17, it is clear from the record that it was actually Mr. Wolfinger's conduct, not Ms. Deppe's, on which Mr. Heydt relied. In fact, Mr. Heydt testified that he never met or talked to Ms. Deppe regarding the removal of the Government's property from the Idabel and Commerce facilities, nor had his attorney talked to Ms. Deppe. Mr. Wolfinger was the only Government agent whom Mr. Heydt dealt with regarding the Government's property at Mr. Heydt's facilities and, therefore, was the Government agent on whose conduct Mr. Heydt relied. Tr. at 550–51.

As the ACO for the Sac & Fox contract, Mr. Wolfinger's responsibilities were to administer the terms and conditions of the contract. Tr. at 93. After the Sac & Fox contract was terminated in March 1991, Mr. Wolfinger's authority was limited to those actions that were specifically requested of, or delegated to, him. *Id.* at 66, 94–95. Ms. Deppe, however, never requested, or delegated authority to, Mr. Wolfinger to enter into any contract or make any representations regarding any contract with Mr. Heydt. Tr. at 332. As such, Mr. Wolfinger, upon whose representations Mr. Heydt relied, did not have the authority to bind the Government to any alleged implied-in-fact contract for the storage of the Government's property. Tr. at 66, 249, 332; *see also Pacific Gas & Elec. Co.*, 3 Cl.Ct. at 339; *Parlane Sportswear Co. v. United States*, 1 Cl.Ct. 58, 61, 553 F.Supp. 1079 (1982), *aff'd*, 727 F.2d 1117 (Fed.Cir. 1983). Therefore, no implied-in-fact contract could have arisen based on Mr. Heydt's contact and dealings with Mr. Wolfinger. *See City of El Centro v. United States*, 922 F.2d 816, 820–21 (Fed.Cir.1990), *cert. denied*, 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991); *Pollack v. United States*, 15 Cl.Ct. 46, 49 (1988).[28]

Based on the undisputed facts in this case, the plaintiffs have failed to demonstrate that an implied-in-fact contract existed. Mr. Heydt is an experienced businessman and Government contractor and is knowledgeable about negotiating and contracting with the Government. Mr. Heydt knew or should have known that Ms. Deppe, not Mr. Wolfinger, possessed the authority to enter into contracts on behalf of the Government, based on his past contractual experience in dealing with her as a contracting officer. In addition, Mr. Heydt knew or should have known that no lease agreement for the storage of

---

**28.** Assuming arguendo that Mr. Heydt relied on Ms. Deppe's, not Mr. Wolfinger's, conduct, Ms. Deppe did not meet the regulatory requirements necessary to enter into a contract with Mr. Heydt. Although Ms. Deppe wrote that "the Government is being assessed rental fees at $80,-000.00 per month," P's Ex. 66, that statement, alone, is not sufficient to form an implied-in-fact contract with Mr. Heydt. In fact, as Ms. Deppe testified at trial, she would have been required to follow the regulations for sole source contracts, as well as satisfy other regulatory requirements, in order to enter into a storage contract with Mr. Heydt. Tr. at 307–12, 344, 370. Therefore, without meeting these requisites, Ms. Deppe did not have the authority to enter into a contract with Mr. Heydt for the storage of the Government's property. *See Domagala v. United States*, 30 Fed. Cl. 149, 152 (1993), *aff'd*, 39 F.3d 1196 (Fed.Cir.1994); *OAO Corp.*, 17 Cl.Ct. at 99–100.

the Government's property could be recognized by the Government until it was properly reviewed and authorized pursuant to the FAR. Moreover, no contract could come into existence merely because an attorney in Mr. Wolfinger's office believed that Mr. Heydt was owed storage costs for the Government's use of Mr. Heydt's facilities.

After the Sac & Fox contract was terminated for default, the Government attempted to remove its property from Mr. Heydt's facilities but was prevented from doing so by Mr. Heydt. While the Government maintained that Mr. Heydt's claim for storage costs and the Government's removal of its property were mutually exclusive issues, Mr. Heydt, however, continued to assert that, before he would allow the Government to remove its property from his facilities, the Government must pay all accrued storage costs and post a cash bond for the cleaning of the facilities. Throughout that time period, the Government never articulated to Mr. Heydt its intent to pay the storage costs or to post a cash cleaning bond. The Government never accepted Mr. Heydt's so-called "offers" to store its property in Mr. Heydt's facilities and always sought to remove its property from Mr. Heydt's facilities. In light of all of the factual circumstances, this Court finds that the parties did not enter into an implied-in-fact contract regarding the storage of the Government's property in Mr. Heydt's facilities. Therefore, the plaintiffs' claim for rents in the amount of $80,000 per month for the period from March 1991 through December 1992 is denied. There was no implied-in-fact contract created between the parties under the facts presented in this case.

### B. Taking Under Fifth Amendment

In the alternative to their implied-in-fact contract claim, the plaintiffs contend in Count II of their Complaint that the Govern-

ment is liable to them for the storage of its property in their facilities because the Government's occupation and use of the property constituted a taking under the Fifth Amendment.[29] Specifically, the plaintiffs contend that the Government's occupancy and use of their facilities located in Idabel and Commerce from March 1991, when the Government terminated Sac & Fox for default, until December 1992, when CIDC conveyed the Commerce property to Security Bank by a warranty deed in lieu of foreclosure, amounted to a temporary taking of the plaintiffs' property that requires just compensation.

▬▬▬ "A taking occurs when the rightful property, contract, or regulatory powers of the Government are employed to control rights or property which have not been purchased." *Alde, S.A.*, 28 Fed. Cl. at 33. A temporary taking, which denies a landowner all use of his property for a finite period of time, requires just compensation in the form of the fair market rental value of the property. *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 315, 107 S.Ct. 2378, 2385–86, 96 L.Ed.2d 250 (1987). Moreover,

> if the United States occupies a person's premises, it is, ordinarily, liable for the rental value thereof even though it occupies them against the will of the owner and without an intention on the part of the United States to pay rent. This liability arises under the Fifth Amendment prohibiting the taking of private property without the payment of just compensation.

*Niagara Falls Bridge Comm'n v. United States*, 111 Ct.Cl. 338, 353, 76 F.Supp. 1018, 1019 (1948). In order to obtain just compensation, a plaintiff need not prove the Government's intent to take property, but needs only to prove that the "invasion of property rights resulting from governmental action was a natural and probable consequence of the governmental acts in question." *Clover-*

---

29. As the Supreme Court has stated, in a similarly-argued circumstance:

> [W]hether the theory of * * * [the suit] be that there was a taking under the Fifth Amendment, * * * or that there was an implied promise by the Government to pay for it, is immaterial. In either event, the claim traces back to the prohibition of the Fifth Amend-

ment, "nor shall private property be taken for public use, with just compensation."

*United States v. Dickinson*, 331 U.S. 745, 748, 67 S.Ct. 1382, 1384–85, 91 L.Ed. 1789 (1947), *quoted in Cuban Truck & Equip. Co. v. United States*, 166 Ct.Cl. 381, 384 n. 3, 333 F.2d 873, 875 n. 3 (1964), *cert. denied*, 382 U.S. 844, 86 S.Ct. 65, 15 L.Ed.2d 85 (1965).

*port Sand & Gravel Co. v. United States*, 6 Cl.Ct. 178, 201 (1984).

### 1. Idabel Property

▮ In this action, Mr. Heydt seeks just compensation from the Government for its occupancy and use of Mr. Heydt's Idabel facility from March 22, 1991,[30] when the Sac & Fox contract was terminated for default, through the end of February 1992, when Mr. Heydt sold his interest in the Idabel property to Hagale effective March 1, 1992. P's Post–Trial Brief at 35. However, for the same reasons that this Court denied Mr. Heydt's implied-in-fact contract claim, this Court also denies Mr. Heydt's takings claim regarding the Government's use of the Idabel property; that is, Mr. Heydt effectively prevented the Government from removing its property until it paid accrued storage costs and posted a cash cleaning bond.

▮ As established at trial, on several different occasions during the time that the Government's property was present at Mr. Heydt's Idabel facility, the Government sought permission to remove its property but was refused access by Mr. Heydt until all storage costs, set by Mr. Heydt at some $80,000 per month, were paid and a cash cleaning bond was posted. Therefore, any interference with the use of the Idabel facility arose only from Mr. Heydt's refusal to allow the Government to remove its property from Idabel, and not from the Government's taking of Mr. Heydt's property. There is no reason why the Government should be charged rents for the storage of its property at the Idabel facility, when it was affirmatively prevented, until March 26, 1992, by Mr. Heydt from removing its property. By re-fusing to allow the Government to remove its property from the Idabel facility without condition, Mr. Heydt, in effect, became a volunteer and allowed his property to be used by the Government without compensation. *See Janowsky*, 36 Fed. Cl. at 157–58: *Niagara Falls Bridge Comm'n*, 111 Ct.Cl. at 353, 76 F.Supp. at 1019. Because the plaintiffs refused to allow the Government to remove its property, they are estopped from asserting that the Government temporarily took the Idabel property in violation of the Fifth Amendment. *See Riggleman*, 215 Ct.Cl. at 869; *Yokum v. United States*, 9 Cl.Ct. 602, 608–09 (1986).[31]

▮ In addition to just compensation for the temporary taking, Mr. Heydt seeks $180,000, in impact damages, which he contends that he lost on the conveyance of the Idabel property to Hagale because of the presence of the Government's property. P's Post–Trial Brief at 27 n. 7. However, Mr. Heydt does not prevail on this claim either. First, Mr. Heydt contends in his post-trial brief that "expert testimony presented by Heydt at trial as well as common sense" proves that there was "impact or damage resulting from the Government's occupation of the Idabel Facility." P's Post–Trial Brief at 39. At trial, however, both Messrs. Heydt and Hagale testified that the presence of the Government's property had *no* impact on the price of the property. Tr. at 576, 646, 653. Second, and more important, a property owner cannot recover consequential damages as an element of just compensation.

It is a well settled principle of Fifth Amendment taking law * * * that the measure of just compensation is the fair

---

**30.** In his takings claim, Mr. Heydt seeks just compensation beginning on March 22, 1991, when, as he contends, the Government terminated Sac & Fox for default and began to use and occupy the Idabel facility. However, Mr. Heydt did not notify the Government of his claim until June 18, 1991. Thus, Mr. Heydt's "actionable period" for the taking did not begin until he provided notice to the Government in his June 18, 1991 letter of this claim for storage costs. *See Wilfong v. United States*, 202 Ct.Cl. 616, 624–25, 480 F.2d 1326, 1330 (1973). Therefore, Mr. Heydt cannot assert a claim for the taking of the Idabel property from March 1991 until June 18, 1991.

**31.** Although the Government did not complete the removal of its property from the Idabel facility until September 1992, Mr. Heydt sold his interest in the Idabel property effective March 1, 1992. Because Mr. Heydt refused the Government access to the Idabel facility until the March 26, 1992 injunction order was issued by the district court, Mr. Heydt has no valid claim for just compensation under the Fifth Amendment for the Idabel property. Mr. Heydt did not have the requisite ownership interest to assert a taking after the Government gained the right by judicial action to remove the Government's property from the premises.

value of what was taken, and not the consequential damages the owner suffers as a result of the taking. * * *

In the present case, Yuba's claim for the difference in the value of the gold [located on the property] during the taking period and after the taking is precisely the kind of claim for consequential damages—here, lost profits—that is not an appropriate element of just compensation for the temporary taking of property.

*Yuba Natural Resources, Inc. v. United States,* 904 F.2d 1577, 1581–82 (Fed.Cir. 1990). As in *Yuba,* the kind of damages sought by Mr. Heydt for the loss of the conveyance of the Idabel property—lost profits—is not an appropriate element of just compensation. *See id.* Therefore, Mr. Heydt is not entitled to recover the $180,000 in impact damages as a part of just compensation.[32]

### 2. Commerce Property [33]

■ In addition to seeking compensation for the Government's use of the Idabel property, CIDC, which was wholly owned by Mr. Heydt, seeks compensation from the Government for its occupancy and use of CIDC's Commerce facility from March 1991,[34] when the Sac & Fox contract was terminated for default, through December 18, 1992, when, as CIDC contends, it delivered and conveyed to Security Bank a warranty deed for the Commerce property. After considering all of the evidence, this Court denies CIDC's claim for just compensation from March 1991 through March 26, 1992, because, up until the March 26, 1992 injunction was issued by the district court, CIDC prevented the Government from removing its property from the Commerce facility.[35] However, for the time period from March 26, 1992, until CIDC effectively conveyed the Commerce property to Security Bank, this Court awards CIDC the fair market rental value of the Commerce property as a result of the Government's temporary taking of the property.

■ According to the FAR, "[c]ontractor inventory shall be removed from the contractor's premises as soon as possible to preclude storage expenses." 48 C.F.R. § 45.612–1 (1992). In addition, the FAR authorizes the contracting officer to store the Government's property pending the proper disposal of the property according to the FAR. *See* 48 C.F.R. § 45.612–3 (1992).[36] As established in this case, *supra,* the Government did not

---

**32.** In addition, Mr. Heydt cannot recover the $180,000 because he failed to mitigate his damages. *See 767 Third Ave. Assocs. v. United States,* 48 F.3d 1575, 1584 (Fed.Cir.1995); *Shelden v. United States,* 34 Fed. Cl. 355, 373 (1995). At the time that Mr. Heydt sold the Idabel property to Hagale, he was refusing to allow the Government to remove its property until storage costs were paid and a cash cleaning bond was posted. Therefore, Mr. Heydt cannot argue at the same time that the presence of the Government's property decreased the Idabel property's value.

**33.** The Government contends that plaintiff CIDC does not have standing to maintain an action for storage costs at the Commerce facility because, unlike the Idabel property, CIDC never formally evicted Sac & Fox from the property under "process of law," as specified by the purchase agreement. D's Post–Trial Brief at 20–21. This Court disagrees with the Government and finds that CIDC does have standing to maintain this action. The provision in the purchase agreement that allowed CIDC to evict Sac & Fox with "process of law" pertains to CIDC's recovery of possession of, not title to, the Commerce property. Sac & Fox never made any payments towards the purchase of the property and never gained title to it from CIDC. The cases on which the Government relies for the "process of law" argument to deny

CIDC standing do not make, as the Government seems to be contending, standing to sue under the Fifth Amendment contingent on an owner's *repossession* of his property through "process of law." These cases simply require that a plaintiff have title to the property during the period in which a taking is claimed. *See, e.g., Illinois v. United States,* 15 Cl.Ct. 399, 410 (1988); *Yokum,* 9 Cl.Ct. at 607. At all times until the sale to Security Bank, CIDC, not Sac & Fox, owned and had title to the Commerce property. CIDC, therefore, has standing to maintain this action.

**34.** *See* footnote 29, *supra.* CIDC, therefore, cannot assert a takings claim from March 1991 until June 18, 1991 for the Government's occupancy and use of the Commerce facility.

**35.** *See* discussion of the Government's taking of the Idabel property, *supra.*

**36.** Section 45.612–3 states, in part, as follows:

(a) Contractor inventory may be stored at the Government's expense only when the contracting officer determines that it should be retained in storage for anticipated use.

*Id.; see also* 48 C.F.R. § 245.612–3 (1992) (Department of Defense FAR Supplement).

enter into an express or implied contract with CIDC for the storage of its property at the Commerce facility. The Government did, however, physically occupy and use the Commerce facility to store its property until it could be disposed of pursuant to the FAR. This physical occupancy and use by the Government constitutes a temporary taking for which CIDC is entitled to just compensation under the Fifth Amendment. *See Niagara Falls Bridge Comm'n,* 111 Ct.Cl. at 355–56, 76 F.Supp. at 1021; *Economic Dev. & Indus. Corp. of Boston v. United States,* 13 Cl.Ct. 590, 603–04 (1987).

Specifically, after the March 26, 1992 injunction, the Government chose to leave its property in the Commerce facility until well after CIDC sold the property to a third party in September 1992. During this period after the injunction, the Government physically occupied most, if not all, of the facility with its property. The Government's continued occupation of the facility after March 26, 1992, was without explanation or any offer to pay CIDC the fair rental value for the Government's use of the facility. After March 26, 1992, Mr. Heydt no longer prevented the Government from removing its property, and the Government's failure to remove its property from Commerce, within a reasonable time, was not due to any action or inaction by Mr. Heydt. The Government simply delayed in removing its property primarily for its own reasons. The evidence at trial indicates that the Government was delayed in obtaining monetary resources to move the Government's property at Commerce, as well as not having sufficient Government personnel to go in and to accomplish the job. Also, the Government chose to start by removing the Government's property from Idabel before moving on to accomplish the job at Commerce. Regardless of the reason for failing to remove its property, the fact is that the Government did not remove its property from the Commerce facility for some ten months after the March 26, 1992 injunction had been issued, even though Mr. Heydt had repeatedly requested that it do so.

CIDC has the right to exclude others, including the Government, from its property, and the Government's occupation and use of the facility constituted a taking of that right to exclude others. *See Goodwyn v. United States,* 32 Fed. Cl. 409, 417 (1994). Under such circumstances, where the Government occupies private property, *i.e.,* the Commerce facility, without the consent of the owner, *i.e.,* CIDC, and without any intention to pay rent therefor, it is liable for the fair rental value of the property under the Fifth Amendment. *See Niagara Falls Bridge Comm'n,* 111 Ct. Cl. at 353, 76 F.Supp. at 1019; *see also* 48 C.F.R. § 45.612–1 (supporting the requirement to compensate a property owner for the Government's storage of its property). Therefore, this Court finds that the Government's occupation and use of the Commerce facility after March 26, 1992, was a temporary taking without just compensation in violation of the Fifth Amendment. Because there was a temporary taking of CIDC's Commerce property, this Court must determine for how long the Government occupied the property and what is the proper measure of just compensation.

Based upon the evidence of record in this case, it is unquestionable that from March 26, 1992, until February 10–11, 1993, the Government occupied and used CIDC's Commerce facility to store its property. Sometime in late 1992, however, CIDC was unable to pay its mortgage on the Commerce property and, in lieu of foreclosure, CIDC conveyed the Commerce property to Security Bank, the mortgagee. While CIDC contends that the conveyance to Security Bank was not effective until December 18, 1992, when the deed was recorded, the Government argues that the conveyance was effective on September 17, 1992, when it was executed by the plaintiff and delivered to the Bank.

For several reasons, this Court agrees with the Government that the conveyance of the Commerce property was effective on September 17, 1992. First, it is well settled in Oklahoma that title to real property passes upon the valid execution and delivery of the deed to the purchaser. *See, e.g., Carlile v. Carlile,* 830 P.2d 1369, 1371 (Okla. 1992); *Brown v. Peck,* 335 P.2d 907, 910 (Okla.1959); *Boys v. Long,* 268 P.2d 890, 892 (Okla.1954). The evidence before this Court demonstrates that the warranty deed was

executed by CIDC on September 17, 1992. D's Ex. 39 at 11. On that day, the warranty deed was made and signed by Mr. Heydt, as president, on behalf of CIDC, and the corporate seal was attached. *Id.* at 2–3, 9, 11. It appears that on November 21, 1992, the warranty deed again was executed by Mr. Heydt, as president, on behalf of CIDC, and attested to with the corporate seal by Virginia Heydt, Mr. Heydt's wife and the secretary-treasurer of CIDC. *Id.* at 10.[37]

The evidence at trial also demonstrates that the deed was delivered to Security Bank on September 17, 1992. Tr. 2 at 12; *see also* OKLA. STAT. tit. 16, § 6.4 (1996) ("It is * * * presumed that delivery occurred on the date of the instrument's execution.").[38] The fact that Security Bank did not record the deed in the Office of the County Clerk for Ottawa County until December 18, 1992, D's Ex. 39 at 9, is irrelevant in determining the passage of title to the property. *See* OKLA. STAT. tit. 16, § 6.4 (stating that it is presumed that delivery occurs on the date of the instrument's execution and that any delay in recording does not rebut this presumption); *May v. Archer,* 302 P.2d 768, 771 (Okla.1956).

Moreover, on December 8, 1992, Security Bank conveyed the Commerce property to third parties, Norman Lee and Norma M. Jeffery. D's Ex. 39 at 16. It is clear that Security Bank could not convey away its ownership interests in the Commerce property before it obtained title to that property. Therefore, Security Bank could not have taken title to the Commerce property from CIDC on December 18, 1992. All of the evidence before this Court demonstrates that the CIDC's conveyance of the Commerce property to Security Bank was effective on September 17, 1992. Therefore, this Court will determine CIDC's just compensation for the period from March 26, 1992, through September 17, 1992.

The proper measure of just compensation for the temporary taking of private property under the Fifth Amendment is the fair market rental value of that property, which is the price that a willing lessee would pay to a willing lessor, for the period of the taking. *See, e.g., Kimball Laundry Co. v. United States,* 338 U.S. 1, 7, 69 S.Ct. 1434, 1438–39, 93 L.Ed. 1765 (1949); *Yuba Natural Resources, Inc.,* 904 F.2d at 1580–81; *Yaist v. United States,* 17 Cl.Ct. 246, 257 (1989). The goal of just compensation is to put the plaintiff in as good a monetary position as he would have been if the taking had not occurred. The best evidence of the fair market value of the property temporarily taken is the comparable rentals of other properties that are reasonably similar to the property taken. *Yaist,* 17 Cl.Ct. at 257; *Cloverport Sand & Gravel Co.,* 6 Cl.Ct. at 189. If comparable rental information is not available, a recent prior lease between the owner of the property and another lessee is indica-

---

**37.** Although, based on the facts before this Court, CIDC's September 17, 1992 execution of the warranty deed does not meet the statutory requirements of OKLA. STAT. tit. 16, § 95 (1996) because the secretary of CIDC did not attest to Mr. Heydt's signature, the execution does meet the spirit and purpose of the law. By its terms, section 95 requires that the valid execution of an instrument by a corporation contain the authorized signature of the president or vice president on behalf of the corporation, the attesting signature of the secretary, and the corporate seal. The *purpose of section 95 is to require acts* sufficient to show that the corporation did execute the instrument in question and is bound by it. *Davidson Oil Country Supply Co. v. Pioneer Oil & Gas Equip. Co.,* 689 P.2d 1279, 1282 (Okla.1984). Strict adherence to the requirements of section 95 is not required if the instrument is executed in the presence, and with the consent, of all of the stockholders, and the instrument is thereafter ratified by the stockholders.

*Freeman v. Warrior,* 409 F.2d 1101, 1103 (10th Cir.1969); *Corvino v. 910 South Boston Realty Co.,* 332 P.2d 15, 17 (Okla.1958). The fact that CIDC's September 17, 1992 execution of the warranty deed did not contain an attestation by CIDC's secretary did not render it invalid. As in *Freeman* and *Corvino,* on September 17, 1992, Mr. Heydt, on behalf of CIDC, executed the warranty deed in the presence and with the consent of all of CIDC's stockholders, namely, Mr. Heydt, as he was the sole stockholder in CIDC at that time. Therefore, as the courts found in *Freeman* and *Corvino,* CIDC was not required to meet the strict requirements of section 95. Based on the evidence presented at trial, this Court finds that CIDC's September 17, 1992 execution of the warranty deed meets the spirit and purpose of section 95 and is, therefore, valid. *See id.*

**38.** Security Bank executed the deed on November 21, 1992. D's Ex. 39 at 10.

tive of the property's fair rental value. *Yuba Natural Resources, Inc.*, 904 F.2d at 1581; *Shelden*, 34 Fed. Cl. at 369. The standard for determining the fair market value of the property taken is based on that property's highest and best use. *Yaist*, 17 Cl.Ct. at 258; *Cloverport Sand & Gravel Co.*, 6 Cl.Ct. at 188. However, the owner of the property must show by a reasonable probability that there is a demand for that proposed use. *Yaist*, 17 Cl.Ct. at 258.

■ As just compensation for the Government's occupancy of the Commerce facility, CIDC seeks $27,280 per month, which its expert witness, Mr. Donald W. Wilson, appraised as the fair market rental value of the property, Tr. 2 at 39, based on the use of comparable rental properties, *see* D's Ex. 117. Of that amount, Mr. Wilson allocated $5,000 per month to the value of the sewing machines and other equipment present in the facility. Tr. 2 at 45. While CIDC's sewing machines were present during the time period that the Government occupied and used the Commerce facility, the value of the sewing machines is not a proper element of CIDC's takings claim, either as a direct taking or as an element of just compensation.

■ This Court has previously found that a plaintiff could not recover the value of personal property under a taking theory just because that personal property was present when the Government took the leasehold:

> Plaintiff concedes that the dredging equipment was personal property which he could have removed from the leasehold property at the time the government condemned the land, without permanent damage to the equipment. Accordingly, since the government did not physically seize nor deprive plaintiff of such equipment, it must be concluded that the government is

not liable to pay plaintiff just compensation therefor on the theory of a direct taking. *Rowland v. United States*, 8 Cl.Ct. 267, 270 (1985), *aff'd*, 790 F.2d 92 (Fed.Cir.1986); *see also Lemmons v. United States*, 204 Ct.Cl. 404, 416–21, 496 F.2d 864, 872–73 (1974). Likewise, CIDC's sewing machines were personal property that Mr. Heydt could have removed from the Commerce facility, without damage, at the time that the DPSC began to occupy it. *See* Tr. 2 at 157. The DPSC did not seize or deprive CIDC of the possession or use of its sewing machines. To the contrary, during the time that the Government's property was in the Commerce facility, Mr. Heydt had access and control over the facility and its contents. As a result, CIDC is not entitled to the $5,000 per month rental value it allocated to the sewing machines that were present in the Commerce facility under a theory of a direct taking.[39]

■ In addition, a plaintiff seeking just compensation from the Government has the duty to mitigate his damages. *See 767 Third Ave. Assocs.*, 48 F.3d at 1584; *Shelden*, 34 Fed. Cl. at 373. In this case, while the Government occupied and used the Commerce facility, CIDC had access to the facility, as well as to the sewing machines and other equipment located there. CIDC could have moved its sewing machines to another location or sold them, as it did after the Government had removed its property, *see* Tr. 2 at 149–50. Because CIDC failed to mitigate its damages by removing the sewing machines from the Commerce facility, it is not entitled to damages for them.

■ The plaintiff's expert witness, Mr. Wilson, argued in his report and at trial that the highest and best use for the Commerce facility is as a state-of-the-art manufacturing

**39.** The value of personal property may be recoverable as part of a plaintiff's just compensation of fair market rental value to put the plaintiff in the same position as if the property had not been taken. *See Kimball Laundry Co.*, 338 U.S. at 7–8, 69 S.Ct. at 1438–39; *United States v. General Motors Corp.*, 323 U.S. 373, 380–83, 65 S.Ct. 357, 360–62, 89 L.Ed. 311 (1945). CIDC is not entitled to the value of the sewing machines as a part of its just compensation because it has not shown, by a reasonable probability, that there is a demand for CIDC's proposed highest and best

use, as a going-concern garment manufacturing facility. The evidence presented at trial demonstrates that the garment manufacturing industry as a whole has been in steady decline throughout the time that the Government occupied CIDC's Commerce facility. Tr. 2 at 175–76, 178. There is no evidence that a willing lessee would pay a willing lessor for the value of CIDC's facility with existing sewing machines and other equipment. Thus, CIDC is not entitled to $5,000 per month for the value of the sewing machines as a part of just compensation.

facility, particularly a clothing manufacturing facility. *See* P's Ex. 105 at 45. Based on that highest and best use, Mr. Wilson appraises the fair market rental value of the Commerce property at $22,280 per month (not including the $5,000 per month that was allocated to sewing machines and other equipment, *see supra* ). On the other hand, Ms. Lynn Fowler, the Government's expert witness, contends that the highest and best use for the Commerce facility is to divide it into sections to be used as incubator space for various manufacturing and nonmanufacturing uses. Based on this highest and best use, Ms. Fowler appraises the Commerce property's fair market rental value at $4725 per month, Tr. 2 at 189, using comparable rental properties, D's Ex. 116.[40]

This Court rejects Mr. Wilson's valuation of the Commerce property at $22,280 per month and finds that Ms. Fowler's valuation of $4725 per month was a result of a more thorough and accurate research process of comparable properties in the surrounding area.[41] The comparable rentals used by Mr. Wilson are not representative of the Commerce property's fair market rental value because they are properties with no similar geographic relation to the Commerce property. Specifically, all of Mr. Wilson's comparables are located in or near Tulsa, Oklahoma, a metropolitan area, Tr. 2 at 108–13, which is approximately 90 miles from Commerce. Although required to make a dollar adjustment for location, *see Goodwyn*, 32 Fed. Cl. at 420, Mr. Wilson failed to adjust his comparables for the fact that they were from around Tulsa. Tr. 2 at 110–11. Therefore, CIDC's comparable rentals cannot be considered reliable in determining the fair market rental value of the Commerce property. *See Yaist*, 17 Cl.Ct. at 258.

To the contrary, Ms. Fowler's six comparables are either in or near Miami, Oklahoma, which is the closest town (within six miles) to the south of Commerce. D's Ex. 104 at 30; Tr. 2 at 178. Based on her research, Ms. Fowler concluded that Miami has "plenty to offer in industrial property, in addition to the fact that the government of Miami is actively seeking new industry." Tr. 2 at 178. Ms. Fowler reasoned that inducements offered by Miami to locate there will decrease the demand for property in Commerce. *See id.* In addition, Ms. Fowler's decreased value for the Commerce property reflects her finding that Commerce, unlike Tulsa, is far from major transportation routes. *Id.*

Mr. Wilson also incorrectly based his valuation of the Commerce property on the dollar figures contained in the purchase agreement between CIDC and Sac & Fox. While evidence of prior transactions relating to the property taken are indicative of its value, *see Yuba Natural Resources, Inc.*, 904 F.2d at 1581, Mr. Wilson's partial reliance on the purchase agreement is unfounded. First, in determining the value of the Commerce property at $22,280 per month, Mr. Wilson's report did not consider initial lease terms of the property at $5,000, then $10,000. per month, Tr. 2 at 101, but only considered the amounts of $45,000 and $80,000 that Sac & Fox agreed to pay. The larger monthly payments of $45,000 and $80,000 per month are not reliable indicators of the property's fair market rental value because: (1) they were made pursuant to Sac & Fox's agreement to purchase, not lease, the property; (2) they included not only the Commerce property, but also other nearby buildings, equipment, and a trained workforce, Tr. at 487, 531–32; (3) Sac & Fox never actually made any $45,000 or $80,000 payments to CIDC and never purchased the property, Tr. at 545–46; and (4) neither Mr. Heydt nor Sac & Fox ever conducted an outside appraisal of the property, Tr. at 536–37, and Mr. Wilson stated at trial that it "would be silly for me to ask [Mr. Heydt] if he did any appraisals [on

**40.** The Government's appraisal does not include the value of the sewing machines and other personal property located in the facility at the time that the Government's property was present. Tr. 2 at 189.

**41.** In fact, Mr. Wilson testified on cross-examination that he did not even attempt to drive around communities to find comparable properties be-

cause, according to Mr. Wilson, "I don't even know how you do that," Tr. 2 at 118, and he did not talk to anyone in those communities because "[i]t's easier to go to the courthouse and search the record and it doesn't take very long to do that," *id.* at 119. Moreover, Mr. Wilson's courthouse search reveals only sales, not rentals. *Id.*

the property]," Tr. 2 at 105. Finally, the transaction between CIDC and Sac & Fox is not reflective of the market because, as Mr. Wilson testified at trial, Sac & Fox did not have anywhere else to go. Tr. 2 at 104–05.

Moreover, CIDC is not entitled to recover for the value of the Commerce property as a manufacturing facility with a trained workforce because that value is based on Mr. Heydt's subjective view of its worth. As the Supreme Court found:

> The value of property springs from subjective needs and attitudes; its value to the owner may therefore differ widely from its value to the taker. Most things, however, have a general demand which gives them a value transferable from one owner to another. As opposed to such personal and variant standards as value to the particular owner whose property has been taken, this transferable value has an external validity which makes it a fair measure of public obligation to compensate the loss incurred by an owner as a result of the taking of his property for public use. In view, however, of the liability of all property to condemnation for the common good, loss to the owner of nontransferable values deriving from his unique need for property or idiosyncratic attachment to it, like loss due to an exercise of the police power, is properly treated as part of the burden of common citizenship.

*Kimball,* 338 U.S. at 5, 69 S.Ct. at 1437–38. As in *Kimball,* the value of the Commerce property as a manufacturing facility with a built-in, trained workforce is a personal, subjective value to Mr. Heydt, and possibly, Sac & Fox,[42] but not to the average manufacturer seeking to lease space to conduct its business. As Ms. Fowler testified at trial, the Commerce facility's size was too big for the market in the area and would more easily lease as smaller units. Tr. 2 at 178–79. The value of the Commerce property as manufacturing (or nonmanufacturing) incubator space has transferable value that has external validity to the Government and other potential lessees of the property. *See id.*

Finally, the purchase agreement executed by CIDC and Sac & Fox, as well as its later sale in lieu of foreclosure to Security Bank, does not sufficiently demonstrate that there was a demand in the early 1990s for manufacturing facilities, such as the Commerce property, with a built-in, trained workforce. *See Yaist,* 17 Cl.Ct. at 258. To the contrary, the evidence shows a steady decrease in the demand for manufacturing facilities in the United States as a whole and especially for garment manufacturing. Tr. 2 at 178. Also, as Mr. Heydt admitted, Commerce was, and is, an economically depressed area, Tr. at 499–500, and could not, therefore, support the rents that CIDC is claiming. Ms. Fowler also demonstrated that the Commerce property has "functional obsolescence" in that it was constructed of concrete, instead of the more versatile metal clad buildings in use today. Tr. 2 at 177. In addition, its long and narrow shape, lack of off-street parking, and lack of maneuverability room for trucks are deficiencies that affect its market value. D's Ex. 104 at 27. Based on these factors, CIDC's appraisal rests on the unfounded assumption that a market existed for its facility and, therefore, cannot withstand judicial scrutiny.

██ Based on the evidence presented by both parties, this Court agrees with the Government's proposed highest and best use for the Commerce facility. Indeed, while Mr. Wilson testified that the Commerce facility's features—its design and trained workforce—make it attractive to manufacturers of products such as clothing, neither this testimony nor Mr. Wilson's report contains evidence that supports CIDC's proposed valuation. CIDC's comparable rentals are not indicative of the value of the property because no market exists for this type of property. In contrast, the comparable rental evidence and detailed analysis presented by the Government appropriately reflects the fair market rental value of the Commerce property based on the analyses of the garment manufacturing industry as a whole, the location of the Commerce property and the comparable

---

42. Sac & Fox apparently agreed to the terms of the purchase agreement because it had nowhere else to go. Tr. 2 at 104–05.

properties, and the size and design of the facility. *See* Tr. 2 at 177–89. Because CIDC has failed to demonstrate that its proposed highest and best use of the Commerce facility as a manufacturing facility with a built-in, trained workforce is reasonably probable, this Court finds that the Government's valuation of $4725 per month is therefore more credible. The Government's valuation is further supported by the lease provisions of the property between CIDC and Sac & Fox for $5,000 and then $10,000 per month. *See Yuba Natural Resources, Inc.,* 904 F.2d at 1581.[43] Therefore, this Court concludes that the fair market rental value of the Commerce property is $5,000[44] per month for the period from March 26, 1992, to September 17, 1992. CIDC is entitled to just compensation in the amount of $30,000 for the approximately six months that the Government temporarily took the Commerce property.[45]

In addition to its claim for the value of the Government's temporary taking, CIDC asserts that the Government is liable for damages due to the loss it sustained on the conveyance of the Commerce property to Security Bank because of the presence of the Government's property in the facility at the time of the conveyance. When CIDC conveyed the Commerce property to Security Bank, Mr. Heydt requested $1.5 million credit on the mortgage but only received $1 million in credit. Therefore, CIDC seeks from the Government the $500,000 credit that CIDC was unable to obtain on its mortgage from Security Bank because it alleges that the value of the Commerce property was diminished by the presence of the Government's property. P's Post–Trial Brief at 32–34. This Court, however, denies CIDC's claim for the $500,000 conveyance loss because CIDC did not meet its burden to prove that the loss was a natural and probable consequence of the taking.

In determining a property owner's just compensation under the Fifth Amendment, this Court will not consider evidence of incidental or consequential damages arising from the Government's taking. *Yuba Natural Resources, Inc.,* 904 F.2d at 1581, 1583; *see also Whitney Benefits, Inc. v. United States,* 18 Cl.Ct. 394, 407 (1989), *aff'd,* 926 F.2d 1169 (Fed.Cir.), *cert. denied,* 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991); *Cloverport Sand & Gravel Co.,* 6 Cl.Ct. at 201–03.

The only evidence that CIDC offered at trial to suggest that the loss of the $500,000 credit on its mortgage was due to the Government's occupancy of the Commerce facility was the testimony of Mr. Steven J. Terbo-

---

**43.** It is important to note that this Court, along with counsel for both parties and with the assistance of Mr. Heydt in explaining the layout of the physical facilities, viewed and inspected the Commerce facility on August 22, 1996. Based upon this Court's site inspection of the facility, this Court agrees with the defendant's valuation of the Commerce facility regarding its location away from major transportation routes, the economically depressed area, and the facility's "functional obsolescence."

**44.** While the Court found the Government's valuation of the Commerce facility of $4725 per month much more credible than the plaintiffs' valuation, this Court increased the facility's fair market rental value slightly, by $275, to $5000 per month based on a consideration of all of the evidence presented by the parties. Specifically, during part of the time that Sac & Fox had occupied the facility, CIDC leased the property to Sac & Fox for $5000 per month for some 12 months and $10,000 per month for the next 48 months. P's Ex. 36 at 2. In addition, the Court inspected the Commerce facility and, therefore, was able to verify its value. Also, there was some attached equipment, hoists, lights, etc., that should be given some value. These factors support this Court's finding that the fair market rental value of the Commerce facility was $5000 per month.

**45.** The Government contends that Mr. Heydt stored camouflage material in the Commerce facility at the same time that the Government's property was present and, therefore, the amount owed as just compensation by the Government should be reduced in an appropriate amount to account for Mr. Heydt's use. D's Post–Trial Brief at 75. The Government, however, has not demonstrated how much of the Commerce facility Mr. Heydt's material occupied. *See* D's Post-Trial Proposed Findings of Fact at 30. Moreover, based on this Court's inspection of the Commerce facility, and its surroundings, this Court concludes that the evidence supports a finding that the Government's property occupied most, if not all, of the space inside the facility from 1989 until February 10 or 11, 1993, when the Government's property was removed from the Commerce facility. Therefore, the Government is not entitled to any reduction in the amount it owes as just compensation.

vich, a former vice president at Security Bank. Mr. Terbovich testified that the presence of the Government's property in the Commerce facility was an important reason why Security Bank would give CIDC only a $1 million credit as opposed to the approximately $1.5 million credit that CIDC sought. Tr. 2 at 6–8. On cross-examination, however, Mr. Terbovich testified that before Security Bank took title to the Commerce property, no appraisal was conducted to determine its actual worth. *Id.* at 14–15.

There is, however, some evidence of an appraisal conducted by Security Bank sometime in 1992 that valued the Commerce property at $750,000, not $1.5 million. *Id.* at 13. In addition, the Ottawa County Assessor's office valued the property at $426,762. P's Ex. 105 at 43; D's Ex. 104 at 24. Moreover, after Security Bank obtained title to the Commerce property from CIDC, it listed the property on the market for only $500,000. D's Ex. 105. Finally, the evidence presented throughout the course of the trial indicates that the United States garment manufacturing industry was in a steady decline throughout the time frame that the Government occupied and used the Commerce facility. Tr. 2 at 175–76. With such a decline, the demand for on-going manufacturing facilities with a built-in, trained workforce, such as CIDC's facility in Commerce, was continuing to diminish.[46] *See Yaist.* 17 Cl.Ct. at 258. Except for Mr. Heydt's bald assertions, there is no evidence that the Commerce property was worth $1.5 million at the time it was conveyed to Security Bank.[47] Therefore, CIDC has not offered sufficient evidence that would establish that CIDC's loss of $500,000 in potential profits was due to the presence of the Government's property. There can be no recovery in such circumstances.

More importantly, the Government temporarily took the Commerce property and CIDC, therefore, is entitled only to the fair market rental value of the property during that period of temporary taking from March 26, 1992, through September 17, 1992. As in *Yuba Natural Resources, Inc.,* 904 F.2d at 1581–82, CIDC's claimed lost profits, *i.e.,* the $500,000 loss in credit on the mortgage, is consequential damages. Therefore, the $500,000 is not an appropriate element of just compensation and is not recoverable.

## C. Summation

On the basis of the entire record, this Court has concluded that the plaintiffs do not prevail on their implied-in-fact contract theory but do partially prevail on their proof of a temporary taking.

The plaintiffs do not recover on the taking theory for any reasonable rental storage costs that were incurred prior to March 26, 1992, for several reasons but primarily because they willfully precluded the Government from recovering its military clothing property from their facilities until that date. No person can create a taking by the Government through his own actions. *See Riggleman,* 215 Ct.Cl. at 869.

The plaintiffs do, however, recover the sum of $30,000, as just compensation (reasonable rental costs), or $5,000 per month, for the six-month period after March 26, 1992, when the plaintiffs were enjoined from interfering with the Government's removal of its stored property, to September 17, 1992, when the plaintiffs' ownership interest in the Commerce property ceased and during which time the Government's goods were being stored in the plaintiffs' Commerce facility.

In addition, an award of just compensation for the temporary taking of property also entitles the owner to interest from the date of the taking to the date of compensation. *Shelden,* 34 Fed. Cl. at 377–78; *Yaist,* 17 Cl.Ct. at 261–62; *Economic Dev. & Indus. Corp. of Boston,* 13 Cl.Ct. at 604; *Foster v. United States,* 3 Cl.Ct. 738, 744–45 (1983), *aff'd,* 746 F.2d 1491 (Fed.Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 478 (1985). Therefore, CIDC is entitled to simple interest from March 27, 1992, until the Government compensates CIDC for the taking. Interest is to be computed at the

---

**46.** By itself, CIDC's purchase agreement with Sac & Fox for the Commerce facility, equipment, and trained workforce is not sufficient to demonstrate such a demand.

**47.** Mr. Heydt admits that he had no outside appraisal conducted on the property to determine its actual fair market worth. Tr. at 536–37.

rate established by the Contract Disputes Act (CDA). 41 U.S.C. § 611 (1994), for the time periods in question.

Because CIDC partially prevailed on its temporary taking claim, it may be entitled to recover reasonable attorneys' fees and expenses pursuant to the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4654(c) (1994). *Yaist*, 17 Cl.Ct. at 263; *Economic Dev. & Indus. Corp. of Boston*, 13 Cl.Ct. at 604. Therefore, to the extent that the plaintiffs wish to make application for fees and expenses, they should do so within thirty days of the date of this Opinion. *See Cloverport Sand & Gravel Co.*, 6 Cl.Ct. at 203. The defendant will have thirty days in which to respond, with the plaintiffs having fifteen days in which to file a reply.

## CONCLUSION

For the foregoing reasons, the Court finds that the parties did not enter into an implied-in-fact contract for the storage of the Government's property. The Court does find, however, that the Government did temporarily take the plaintiff's property without just compensation in violation of the Fifth Amendment. Therefore, the plaintiff, CIDC, is entitled to just compensation in the amount of $30,000, from March 26, 1992, through September 17, 1992, plus interest from the date of taking (March 26, 1992), and any attorney fees and expenses found due and owing.

Upon a determination of the plaintiffs' attorneys' fees and expenses (if any), judgment will be entered as provided above.